MAYAGÜEZ HILTON CORPORATION, peticionaria, *v.* HUMBERTO BETANCOURT ET AL., recurridos.

*Número:* CC-2000-259 *Resuelto:* 19 de febrero de 2002

*Anabelle Rodríguez* y *Juan A. Frau Escudero*, abogados de la peticionaria; *Eugenio C. Romero* y *Rolando Anglada Gil*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR CORRADA DEL RÍO emitió la opinión del Tribunal.

## I

En 1990 el hotel Mayagüez Hilton (en adelante el Hilton) demandó a International Casino Management, Inc. (en adelante I.C.M.) y a Humberto Betancourt (en adelante el señor Betancourt), su accionista principal, solicitando una sentencia declaratoria que decretara inválido un acuerdo otorgado entre éstos el 20 de marzo de 1986, denominado *Casino Management Agreement*.[1] Solicitó, además, que el tribunal autorizara la consignación de la suma de quinientos once mil quinientos un dólares ($511,501) a favor del señor Betancourt en concepto de la deuda vigente para 1987 a 1989, en virtud del acuerdo en cuestión.

El 18 de diciembre de 1987 Hilton y el señor Betancourt habían otorgado un segundo acuerdo titulado *Casino Consultant Agreement* (en adelante contrato de consultoría). El acuerdo disponía para que, comenzando el 1ro de enero de 1988, el señor Betancourt fungiera como consultor para el hotel en todo aquello que se relacionara con la operación del casino del Hilton. La segunda cláusula del contrato disponía de la manera siguiente en su traducción al idioma español:

> Este acuerdo estará vigente hasta el 31 de diciembre de 1993. Sin embargo, cualquiera de las partes podrá resolver el mismo si el casino incurre en pérdidas operacionales por dos (2) años consecutivos. *Disponiéndose, sin embargo, que el señor Betancourt tiene la opción de renovar este contrato por un término adicional de cinco (5) años si los primeros cinco (5) años de operación producen una ganancia neta de operación de dos millones quinientos mil dólares ($2,500,000) antes del pago de impuestos.* Durante el período de renovación, la operación (del casino) tendrá que producir ganancias netas de quinientos mil dólares ($500,000) antes de impuestos. Si el casino no produce un margen de ganancias netas de quinien-

---

[1] Apéndice del recurso de *certiorari*, pág. 22.

tos mil dólares ($500,000) para cualquiera de esos cinco (5) años, el contrato podrá resolverse a petición de Hilton. Este acuerdo terminará sin responsabilidad para ninguna de las partes en la eventualidad de que la licencia de Hilton terminara por cualquier razón. (Traducción nuestra y énfasis suplido.)[2]

Ante la demanda de Hilton, el señor Betancourt presentó una reconvención y demanda contra los terceros Hilton International, Hilton International of Puerto Rico Inc., Rupert E. Hubert, Mehdi Naqvi, Moises Rivas y Dieter Huckestein, oficiales de las empresas mencionadas, sus respectivas esposas y las sociedades legales de gananciales por ellos compuestas.[3] En la reconvención, el señor Betancourt hizo referencia a la cláusula antes citada, como un derecho de opción que tenía este último para renovar el contrato de consultoría por cinco años adicionales, de cumplirse con la condición expresada.

El 30 de octubre de 1992, mediante sentencia parcial, el Tribunal de Primera Instancia (en adelante el T.P.I.) declaró ha lugar la demanda presentada por Hilton y decretó la nulidad del *Casino Management Agreement,* por éste violar las disposiciones de la Ley de Juegos de Azar.

El 31 de enero de 1993, once meses antes de la fecha pactada para su vencimiento, Hilton dio por terminado el contrato de consultoría. Las partes intentaron negociar la compensación del señor Betancourt para 1989 a 1992, durante los cuales estuvo vigente el acuerdo. Ante la

---

[2] El texto en su idioma original era el siguiente:

"This agreement will terminate on December 31, 1993 provided, however that either party may terminate this agreement if the casino incurs in operating losses for two consecutive years. Provided, however that Mr. Betancourt has the option of renewing this contract for an additional five (5) years period if the first five years of operation produce a net operating profit in excess of $2,500,000. During the renewal period the operation must produce a net operating profit of $500,000 before taxes per year. Should the casino not produce a net operating profit of $500,000 in any of the five (5) years this contract may terminate at Hilton's request. This agreement will terminate without liability to either party in the event Hilton's license terminates for any reason." Apéndice, págs. 46–47.

[3] Apéndice del recurso de *certiorari,* pág. 57.

complejidad de las partidas reclamadas, el T.P.I. nombró un comisionado especial.

A raíz de la cancelación prematura del contrato, el 11 de julio de 1995 el señor Betancourt sometió una moción en la que solicitó enmendar las alegaciones de su reconvención y demanda contra terceros. Ello con el propósito de particularizar su reclamación por incumplimiento de contrato y solicitar una indemnización por los honorarios durante 1994 a 1998, bajo la opción otorgada en el contrato de consultoría, de renovarlo por cinco (5) años.[4]

El 31 de octubre de 1996 el señor Betancourt presentó una Moción de Sentencia Sumaria Parcial, en la cual solicitó al T.P.I. que adoptara el informe presentado por el Comisionado Especial designado y que ordenase el pago de las partidas allí detalladas.[5] Solicitó, además, que adjudicara una compensación para el período comprendido desde la cancelación prematura del contrato de consultoría y el vencimiento del contrato en cuestión, según lo originalmente pactado, entiéndase desde el 31 de enero al 31 de diciembre de 1993. Posteriormente, el 14 de noviembre de 1996, presentó otra Moción de Sentencia Sumaria Parcial, en la cual adujo que la actuación unilateral de Hilton de dar por terminado prematuramente el contrato, impidió que éste pudiese ejercer su opción de renovarlo por cinco años adicionales.[6] Alegó que la opción de renovar el contrato estaba sujeta a la condición de que la operación del casino durante los primeros cinco años produjera un ingreso neto operacional mayor de dos millones quinientos mil dólares ($2,500,000), condición que para fines del segundo año de operaciones se había cumplido. Añadió que Hilton, al cancelar el contrato, impidió que se cumpliera el término de cinco años previsto para el contrato de consultoría, pretendiendo con ello evadir su obligación de renovar

---

[4] Íd., págs. 96–98.

[5] Íd., pág. 139.

[6] Íd., pág. 162.

el contrato a opción del señor Betancourt. En consecuencia, solicitó que, mediante sentencia sumaria, el T.P.I. determinara que tenía derecho a renovar el contrato por cinco años adicionales.

El T.P.I., mediante Sentencia Parcial de 31 de enero de 1997, dispuso la retribución a la cual tenía derecho el señor Betancourt desde 1989 a 1993 inclusive, de acuerdo con las sumas que recomendó el informe del Comisionado Especial y adjudicó la controversia referente a la cancelación prematura del contrato de consultoría.[7] No obstante, mediante resolución emitida en igual fecha, el T.P.I. dejó expresamente pendiente la existencia o inexistencia de justa causa para la cancelación prematura de dicho contrato.[8] También, dejó pendiente la controversia relativa al derecho del señor Betancourt a ejercitar la opción contractual que hubiera extendido el contrato por un segundo término de cinco años, reclamación aducida por éste en su segunda moción de sentencia sumaria, y la cuantía a pagar por dichos daños adicionales.

El 19 de junio de 1997, Hilton presentó una moción de reconsideración, la cual fue denegada mediante resolución de 25 junio de 1997. El T.P.I. concluyó que sólo quedaba pendiente de resolver la controversia en torno al derecho del señor Betancourt a que se extendiera el contrato de consultoría por cinco años adicionales.[9]

---

[7] El Tribunal de Primera Instancia (en adelante el T.P.I.) utilizó el lenguaje que requiere la Regla 43.5 de Procedimiento Civil, 32 L.P.R.A Ap. III, para imprimir finalidad a una sentencia parcial.

[8] Pese a no haberse pronunciado sobre la existencia de justa causa para la cancelación prematura del contrato, el T.P.I., no obstante, otorgó en su sentencia parcial una compensación para el período comprendido entre la fecha en que Hilton dio por resuelto el contrato de consultoría, el 31 de enero de 1993, y la fecha de terminación originalmente pactada, 31 de diciembre de 1993.

[9] El T.P.I. señaló: "En nuestra Sentencia Parcial resolvimos la controversia entre las partes en lo referente al *Casino Consultant Agreement*, cuyo término expreso de vigencia fue entre el 1 de enero de 1988 y 31 de diciembre de 1993. Como claramente indicamos en la Resolución y Orden del 31 de enero de 1997, *nos resta resolver la controversia sobre la extensión de dicho contrato por cinco (5) años adicionales.* El pago por el año 1993 quedó resuelto conforme a los términos de la Sentencia Parcial que adjudicó los elementos que bajo el contrato daban margen a la resolución del mismo". Resolución y orden del T.P.I. de 25 de junio de 1997, págs. 1–2.

Hilton, oportunamente, presentó ante el Tribunal de Circuito de Apelaciones (en adelante el T.C.A.) un escrito titulado Petición de *certiorari* y/o escrito de apelación, mediante el cual solicitó la revisión de la sentencia parcial dictada por el T.P.I. el 31 de enero de 1997. El foro apelativo rechazó los planteamientos de Hilton referentes a que la cancelación prematura del contrato se debía al incumplimiento del señor Betancourt con sus cláusulas, por éstos haber sido formulados tardíamente. Procedió a confirmar la sentencia sumaria parcial dictada por T.P.I.

Mientras tanto, luego de varios incidentes procesales, el 13 de septiembre de 1999 el T.P.I. declaró ha lugar la segunda moción de sentencia sumaria parcial presentada por el señor Betancourt el 14 de noviembre de 1996.[10] Resolvió que el acuerdo de consultoría era un contrato de arrendamiento de servicios profesionales y que la segunda cláusula del acuerdo en cuestión no era una opción, sino una cláusula de renovación por un período adicional de cinco años.[11] Concluyó, además, que la renovación era una obligación sujeta a la condición suspensiva de que durante los primeros cinco años del contrato original el casino obtuviera una ganancia neta de más de dos millones quinientos mil dólares ($2,500,000). Sostuvo que Hilton, al cancelar injustamente el contrato de consultoría antes de su vencimiento, impidió que se cumplieran las condiciones que hubieran dado lugar al segundo contrato, aunque a la fecha de la cancelación del contrato, entiéndase el 31 de enero de 1993, ya se había cumplido la condición que requería la ganancia de dos millones quinientos mil dólares ($2,500,000). Aplicando el Art. 1072 del Código Civil, 31

---

[10] Dicha moción de sentencia sumaria versaba sobre la reclamación del derecho de opción.

[11] El T.P.I. rechazó los argumentos del señor Betancourt en la Moción de Sentencia Sumaria Parcial, referentes a que la susodicha cláusula era de opción. Ello, bajo el fundamento de que no había plazo cierto para su ejercicio y que, además, el estar ésta condicionada a que ocurrieran otros factores para que el derecho se perfeccionara (condiciones sobre el margen de ganancias del casino), impedía que su ejercicio dependiera de la exclusiva voluntad del señor Betancourt.

L.P.R.A. sec. 3047, concluyó que ello tuvo el efecto de que las condiciones se entendieran por cumplidas, o sea, como si el derecho se hubiera ejercido.[12]

Finalmente, puntualizó que Hilton, de manera dolosa, provocó la imposibilidad del cumplimiento de la obligación al dar por terminado el contrato original antes de su fecha de vencimiento. En consecuencia, ordenó a Hilton indemnizar al señor Betancourt por la suma correspondiente al sueldo dejado de devengar durante el tiempo que hubiese estado vigente el nuevo contrato.[13] Sostuvo, además, que procedía indemnizar al señor Betancourt por las angustias mentales que hubieran podido preverse al tiempo de constituirse la obligación, y que fueran consecuencia necesaria de su incumplimiento.[14]

Hilton acudió al T.C.A. para aducir que la cláusula en controversia era una de opción, cuyo término para ejercitarla había caducado una vez se cumplió con el margen de ganancias de dos millones quinientos mil dólares ($2,500,000).[15] Cuestionó, a su vez, la determinación del TPI, referente a que había mediado dolo en la cancelación del contrato. Señaló que la controversia relativa a la cancelación del contrato había sido resuelta previamente mediante la sentencia parcial dictada el 31 de enero de 1997 y que, a su entender, ésta no se había pronunciado sobre la existencia de dolo contractual. Finalmente, atacó el nombramiento de un Comisionado Especial para llevar a cabo la determinación de los daños.

---

[12] El Art. 1072 del Código Civil, 31 L.P.R.A. sec. 3047, dispone, "Se tendrá por cumplida la condición cuando el obligado impidiese voluntariamente su cumplimiento."

[13] Se ordenó la indemnización por el período comprendido desde el 1ro de enero de 1994 hasta el 7 de mayo de 1997, fecha cuando la licencia de Hilton expiró conforme a la certificación expedida por la Compañía de Turismo el 14 de mayo de 1999.

[14] El tribunal no hizo determinación sobre las cuantías que habrían de ser concedidas como consecuencia de su dictamen.

[15] Surge del expediente que al finalizar el 1990 el casino ya había obtenido una ganancia neta de sobre dos millones quinientos mil dólares ($2,500,000).

Mediante Sentencia de 15 de febrero de 2000, el T.C.A. confirmó, aunque por distintos fundamentos, el dictamen del T.P.I. Señaló que la cláusula en cuestión era opción de renovar. Añadió que, aunque la renovación del contrato sólo se podía dar si se cumplía la condición suspensiva, aun cumplida la condición, el señor Betancourt conservaba el derecho de ejercer o rechazar la opción de renovar. Determinó que al haberse cumplido la condición, la opción de renovar quedó vigente a favor del señor Betancourt. En cuanto al plazo para ejercer la opción, señaló que el señor Betancourt tenía derecho a hacer ejercicio de ésta al vencerse el término del contrato original, es decir, el 31 de diciembre de 1993. Enfatizó que al Hilton dar por terminado el contrato unilateralmente, once meses antes de su vencimiento, privó al señor Betancourt de ejercer su derecho de opción, ya que al momento determinado para ejercer dicho derecho, el contrato ya estaba resuelto. Concluyó que Hilton no podía beneficiarse de sus actos ilegales para privar al señor Betancourt de sus derechos en virtud de la opción. Considerando que éste ejerció su derecho de opción por la vía judicial oportunamente, el T.C.A. confirmó el dictamen del T.P.I. en cuanto al derecho a recobrar la ganancia perdida bajo los términos del contrato renovado. También confirmó la determinación de dolo contractual[16] y rechazó los planteamientos de Hilton sobre el nombramiento de un Comisionado Especial.

Inconforme con el dictamen referido, Hilton acude ante nos vía recurso de *certiorari* y señala la comisión de los errores siguientes:

Primer error
Erró el Tribunal de Circuito de Apelaciones al concluir que el Mayagüez Hilton incurrió en dolo, a pesar que el beneficiario de esa determinación[,] Humberto Betancourt, nunca alegó ni reclamó dolo contractual.

---

[16] El T.C.A. enfatizó que coincidía con la determinación que hiciera el T.P.I. en cuanto a que medió dolo en la terminación ilegal del contrato y los daños que tenía derecho a recobrar el señor Betancourt de probarlos en una vista plenaria.

Segundo error

Erró el Tribunal de Circuito de Apelaciones al concluir que no habiendo mediado justa causa para la cancelación del Contrato de Consultoría suscrito entre el Mayagüez Hilton y Heriberto Betancourt, dicha cancelación constituye una actuación dolosa de parte del Mayagüez Hilton.

Tercer error

Erró el Tribunal de Circuito de Apelaciones al confirmar la determinación del Tribunal de Primera Instancia de que hubo dolo contractual en la cancelación del Contrato de Consultoría, cuando ese asunto ya había sido resuelto en contrario y esa determinación constituye la ley del caso.

Cuarto error

Erró el Tribunal de Circuito de Apelaciones al concluir que la opción contractual contenida en el Contrato de Consultoría sobrevivió la cancelación de este último y que fue ejercitada, válidamente, durante el trámite judicial de este caso.

Quinto error

Erró el Tribunal de Circuito de Apelaciones al no resolver que el derecho de opción reconocido en el Contrato de Consultoría había caducado.

Sexto error

Erró el Tribunal de Primera Instancia, al nombrar un comisionado especial para llevar a cabo la determinación del monto de los daños y perjuicios a que tiene derecho el demandado y disponer que, en cuanto a este particular, la determinación del comisionado especial será firme. Petición de *certiorari*, págs. 13–14.

Mediante Resolución de 5 de mayo de 2000 este Tribunal proveyó no ha lugar al recurso. Ante una moción de reconsideración presentada por Hilton el 22 de mayo de 2000, reconsideramos nuestro dictamen y, mediante Resolución de 9 de junio de 2000, expedimos este auto de *certiorari*. A petición de Hilton, acogimos el recurso como su alegato. El recurrido sometió su correspondiente alegato posteriormente, por lo cual estamos en posición de resolver.

## II

Comenzaremos por discutir conjuntamente los errores cuarto y quinto, por estar ambos íntimamente relacionados entre sí.

■ En *Atocha Thom McAn, Inc. v. Registrador*, 123 D.P.R. 571 (1989), al evaluar la figura del contrato de opción, lo definimos como el convenio por el cual una parte (llamada concedente, promitente u optatario) concede a la otra (llamada optante), por tiempo fijo y en determinadas condiciones, la facultad, que se deja exclusivamente a su arbitrio, de decidir respecto a la celebración de un contrato principal. Son requisitos esenciales del contrato de opción, la concesión por una parte a la otra de la facultad de decidir sobre la celebración del contrato por el cual se opta, de modo exclusivo, por plazo cierto y sin otra condición que el propio juicio del optante. J. Castán Tobeñas, *Derecho civil español, común y foral*, 14ta ed., Madrid, Ed. Reus, 1988, T. IV, pág. 50.

El tratadista Puig Brutau[17] señala que en este tipo de contrato no se opta por optar, sino que la opción es la posibilidad de perfeccionar un contrato previamente delimitado. Es decir, no hay un contrato que sea sólo de opción, sino una posibilidad de optar al contrato que se haya tenido en cuenta como resultado final de la negociación.

■ El derecho que origina el pacto de opción es un derecho potestativo o de formación, que puede ser constitutivo, modificativo o extinto y que se caracteriza por producir inmediatamente el efecto por la sola declaración de voluntad del titular, sin que exista una obligación principal correlativa a cargo de otro sujeto. J. Sánchez Fontáns, *Naturaleza de la Opción*, Año XII (Núm. 17) Rev. Der. Español y Americano 73 (1967).

El contrato de opción, de naturaleza transitoria, puede ser principal o un pacto accesorio a otro. *Atocha Thom McAn, Inc. v. Registrador*, supra. Así pues, la opción es aplicable a un sinnúmero de contratos. El catedrático de

---

[17] J. Puig Brutau, *Fundamentos de Derecho Civil*, Barcelona, Ed. Bosch, 1982, T. II, Vol. 2, págs. 48–65.

Dercho Civil Torres Lana([18]) contempla la aplicabilidad de la figura a contratos como el de compraventa, sociedad, financiamiento, arrendamiento de cosas y de servicios.

■ Nuestra doctrina también ha reconocido la figura de la opción de renovar. Véanse al respecto: *Atocha Thom McAn, Inc. v. Registrador*, supra; *Zeta Enterprises, Inc. v. E.L.A.*, 145 D.P.R. 1 (1998). Ésta se refiere a la facultad que se le confiere a uno de los contratantes para que, a su arbitrio, decida sobre la renovación o extensión de un contrato ya vigente entre las partes. En estos casos, la opción produce como efecto una mera modificación de la relación contractual. Es, por lo tanto, una opción modificativa. En *Atocha Thom McAn, Inc. v. Registrador*, supra, pág. 585, al comparar la figura de opción de extensión de un arrendamiento con aquella de la prórroga, señalamos:

> La diferencia estriba en que mientras en el contrato de prórrogas su continuación es un hecho cierto —pues ya hay acuerdo de voluntades— en el de opción el arrendamiento está sujeto a una condición incierta: el ejercicio del derecho por parte del optante. En puridad jurídica no puede, pues, hablarse de un contrato de prórrogas de arrendamiento si existe incertidumbre sobre su existencia.

Teniendo esto en mente, pasemos a evaluar el contrato otorgado por Hilton y el señor Betancourt e interpretar sus términos, conforme lo dispone la normativa de nuestro ordenamiento jurídico en los Arts. 1233 y 1236 del Código Civil, 31 L.P.R.A secs. 3471 y 3474, entre otros.([19]) Véanse, además: *Levy v. Aut. Edif. Públicos*, 135 D.P.R. 382 (1994);

---

([18]) J. Torres Lana, *Contrato y Derecho de Opción*, 2da ed., Madrid, Ed. Trivium, 1987, pág. 98.

([19]) Dispone el Art. 1233 del Código Civil:

"Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

"Si las palabras parecieren contrarias a la intención evidente de los contratantes, prevalecerá ésta sobre aqu[é]llas." 31 L.P.R.A. sec. 3471.

Añade el Art. 1236:

"Si alguna cláusula de los contratos admitiere diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto." 31 L.P.R.A. sec. 3474.

*Marina Ind., Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983); *Merle v. West Bend Co.*, 97 D.P.R. 403 (1969); *Rutledge v. Gill*, 78 D.P.R. 698 (1955).

De un análisis contextual de los términos esbozados en las cláusulas del contrato en cuestión, en especial, la segunda cláusula previamente citada, podemos colegir que Hilton y Betancourt otorgaron un contrato de arrendamiento de servicios, el cual contenía a su vez una opción de renovar a favor del señor Betancourt, sujeta al cumplimiento de ciertas condiciones.[20] Entendemos que cumplida la condición suspensiva a la cual quedaba supeditada el ejercicio de la opción, el señor Betancourt tenía la potestad de ejercer o no su derecho de opción y renovar el contrato de arrendamiento de servicios.

La inclusión de las condiciones en cuestión no alteraban la naturaleza de la opción. En *Zeta Enterprises, Inc. v. E.L.A.*, supra, pág. 10, ante un contrato de servicios que incluía a su vez una opción de extensión, nos expresamos sobre la posibilidad de un derecho de opción sujeto al cumplimiento de una condición, y señalamos: "[s]in embargo, en el contrato que nos concierne, el poseedor del derecho de opción no dispone de un ámbito ilimitado de voluntariedad, sino que su derecho está expresamente supeditado al cumplimiento de dos condiciones .... Estas disposiciones cualifican el ámbito de la opción, conforme a la voluntad de las partes contratantes".

Hilton alega en su recurso ante nos que si bien es cierto que la citada cláusula segunda establecía un contrato de opción, ésta no fue ejercida dentro del período de cinco años de vigencia del contrato, ya que el señor Betancourt nunca le expresó su deseo de ejercer la opción durante di-

---

[20] La segunda cláusula del contrato especificaba:

"... Mr. Betancourt has the option of renewing this contract for an additional five years *if the first five (5) years of operation produce a net operating profit in excess of $2,500,000.* During the renewal period the operation *must produce a net operating profit of $500,000 before taxes per year.*" (Énfasis suplido.) *Casino consultant agreement*, pág. 2.

cho plazo. Añade que la cláusula de opción no era más que una disposición accesoria a un contrato principal, y que al éste ser cancelado desaparecieron todos sus derechos accesorios, por lo tanto, el derecho a ejercer la opción había caducado. No tiene razón.

■ El derecho de opción se extingue mediante su ejercicio positivo, quedando entonces perfeccionado el contrato aceptado. Igualmente se extingue, sin este efecto positivo, si se deja transcurrir el plazo concedido para optar sin hacer ninguna manifestación, o haciendo alguna que tenga la eficacia de una renuncia del derecho.[21] Por la naturaleza temporal del contrato, éste no es imaginable sin un plazo para su ejercicio, por reducido o indeterminado que sea. Por lo tanto, se suele visualizar el plazo para el ejercicio de la opción como un plazo de caducidad. Por tal razón, el derecho del optante a declarar su voluntad de dar efectividad al contrato por el cual se opta, caduca, si ésta no es notificada al concedente durante la vigencia del plazo de la opción, si éste se hubiese fijado.

Una lectura del contrato en cuestión nos convence de que, dada la naturaleza de las condiciones impuestas para el ejercicio de la opción y las disposiciones sobre la cancelación del contrato principal, era imperativo esperar hasta el fin del término del contrato original para que el señor Betancourt pudiera expresarse sobre su deseo de ejercer o no la opción. Esto, independientemente de cuándo se hubiese alcanzado la condición sobre la ganancia neta de al menos dos millones quinientos mil dólares ($2,500,000).[22]

Esto no fue posible dado que Hilton, al dar por terminado el contrato, sin justa causa, y once meses antes de su

---

[21] Puig Brutau, *op. cit.*, pág. 64.

[22] Véase esc. 20. Nótese, además, las siguientes disposiciones contenidas en la citada segunda cláusula del contrato:

"[P]rovided, however that either party may terminate this agreement if the casino incurs in operating losses for two consecutive years.

"Should the casino not produce a net operating profit of $500,000 in any of the five years this contract may terminate at Hilton's request."

vencimiento, privó al señor Betancourt de la oportunidad de ejercer su derecho a opción.[23]

■ El concedente de la opción se encuentra vinculado en un doble aspecto: "no estorbar el posible cumplimiento del contrato definitivo y cumplir con éste."[24] Ante lo cual, conforme el jurista Torres Lana, *op. cit.*, pág. 109, advierte, "no parece que el concedente se vea impedido para celebrar cualesquiera otros contratos, sino sólo aquellos que supongan un obstáculo al ejercicio de la opción concedida".

Sobre este particular Sánchez Fontáns, *op. cit.*, pág. 94, señala:

> ... el pacto de opción genera un derecho potestativo que atribuye al titular la potestad de producir el efecto, normalmente la conclusión del contrato, por su sola declaración de voluntad. A ese fin es irrelevante la conducta asumida por el oferente. Sin embargo, el oferente puede realizar actos que impidan el nacimiento o el ejercicio de los derechos que resultan del contrato definitivo *y compromete en tal caso su responsabilidad contractual.* (Énfasis suplido.)

Por lo tanto, entendemos que así como el concedente tiene la obligación de no hacer nada que pueda frustrar la efectividad del contrato si el optante ejercita a tiempo su derecho, tampoco puede incurrir en actuaciones voluntarias, negligentes o dolosas que puedan frustrar la expectativa del optante a hacer ejercicio de su derecho a opción. De hacerlo, incurrirá en responsabilidad contractual y el optante perjudicado podrá interponer una acción indemnizatoria contra el concedente que frustró o perjudicó el ejercicio de la facultad de optar.

Aplicando estos principios al caso de autos, si bien es cierto que la cláusula de opción era accesoria al contrato

---

[23] Se podría argüir que el plazo fijado para el ejercicio de la opción era durante el sexto y último año del contrato original, es decir, el llamado "renewal period". Sin embargo, a igual conclusión llegaríamos si adoptáramos dicho supuesto, toda vez que Hilton canceló unilateralmente el contrato treinta días luego de haber comenzado dicho período.

[24] Torres Lana, *op cit.*, pág. 108.

principal y que el señor Betancourt no la había ejercido al momento de cancelarse el contrato, ello no impide que sea indemnizado por los daños y perjuicios sufridos a consecuencia de no haber podido ejercer la opción.(25)

 Quedan sujetos a la indemnización de los daños y perjuicios causados los que en el cumplimiento de sus obligaciones incurrieren en dolo, negligencia o morosidad, y los que de cualquier modo contravinieren al tenor de aquéllas.(26) *Master Concrete Corp. v. Fraya, S.E.*, 152 D.P.R. 616 (2000). "Viéndose el optante imposibilitado de pedir el cumplimiento *in natura* ... puede pedir el cumplimiento en la forma supletoria de resarcimiento de daños y perjuicios". Véase *Pérez v. Sampedro*, 86 D.P.R. 526, 530 (1962). La indemnización de daños y perjuicios comprende no sólo el valor de la pérdida sufrida, sino también el de la ganancia que haya dejado de obtener el acreedor. Art. 1059 del Código Civil;(27) *Pérez v. Sampedro*, supra. Estando ante una reclamación por incumplimiento contractual, forzoso es concluir que el señor Betancourt ejerció su acción oportunamente.(28) No podemos acoger la postura de Hilton referente a que el derecho a ejercer la opción se había extinguido al cancelarse el contrato, ya que dicho derecho fue coartado por el propio Hilton con su conducta antijurídica. Hilton no se puede beneficiar de sus propios actos ilegales para privar al beneficiario de sus derechos. Los alegados errores no se cometieron.

---

(25) Nótese que al momento de la cancelación del contrato, durante su último año de vigencia, ya se había cumplido la condición de que la ganancia neta en los primeros cinco años excediera a dos millones quinientos mil dólares ($2,500,000), y los ingresos anuales del casino superaban los quinientos mil dólares ($500,000). En cuanto a la condición de ganancia durante el "renewal period", es aplicable el Art. 1072 del Código Civil, *supra*.

(26) Art. 1054 del Código Civil, 31 L.P.R.A sec. 3018.

(27) 31 L.P.R.A. sec. 3023.

(28) Por no tener un término prescriptivo, las acciones por el quebrantamiento o incumplimiento de contrato prescriben a los quince años. Art. 1077 del Código Civil, 31 L.P.R.A. sec. 3052.

## III

Procedemos a evaluar los errores primero y segundo. Éstos versan sobre la determinación del T.C.A. a los efectos de confirmar la determinación del T.P.I. de que Hilton actúo dolosamente al dar por terminado el contrato de consultoría antes de su fecha de vencimiento.

El T.C.A. puntualizó en su dictamen que la conducta de Hilton fue intencional y que era obvio que sus acciones estaban dirigidas a provocar un incumplimiento de las obligaciones y privar a los recurridos de su derecho a ejercer la opción. Concluyó que no se trataba de un caso de mero incumplimiento, sino de un incumplimiento de mala fe, planificado para evitar que los recurridos ejercieran su derecho de opción y continuaran con la consultoría por el periodo de tiempo dispuesto en la opción. Fundamentó dicha determinación en vista de las mociones presentadas ante el T.P.I.(29)

■ Al hablar del incumplimiento de una obligación, debemos distinguir entre el incumplimiento doloso y el incumplimiento culposo, según que la posición del obligado frente al vínculo sea una insatisfacción conscientemente querida o, por el contrario, se haya producido el incumplimiento debido a su conducta negligente. F. Puig Peña, *Compendio de Derecho Civil Español*, 3ra ed., Madrid, Ed. Pirámide, 1976, T. III, pág. 142.

El dolo, en el incumplimiento contractual, es la negativa consciente y voluntaria del deudor a cumplir con su obligación, sabiendo que realizará un acto injusto. *Colón v. Promo Motor Imports, Inc.*, 144 D.P.R. 659 (1997); *Canales v. Pan American*, 112 D.P.R. 329 (1982); *Márquez v. Torres Campos*, 111 D.P.R. 854 (1982). Ello supone que el obligado tenga conocimiento de la obligación que sobre él pesa, del

---

(29) Sentencia del Tribunal de Circuito de Apelaciones de 15 de febrero de 2000, pág. 9. Apéndice del recurso de *certiorari*, pág. 10.

acto o la abstención que va a realizar y de las consecuencias que ello produce.([30]) Es decir, el dolo no implica, necesariamente, un designio malévolo del deudor, sino sólo conocimiento del hecho de su propio incumplimiento, consciente de que ha de afectar la expectativa del acreedor.

Hilton entiende que el T.C.A. erró al concluir que éste había actuado dolosamente, a pesar de que, a su entender, el señor Betancourt nunca alegó ni reclamó dolo contractual. Arguye que en ningún momento del litigio en cuestión el señor Betancourt invocó el vocablo "dolo" para tipificar la actuación de Hilton. Veamos.

"Tanto bajo el dolo en la formación del contrato ... como en el dolo en el cumplimiento de la obligación corresponde a quien reclama dicha conducta dolosa la responsabilidad de la prueba." *Colón v. Promo Motor Imports, Inc.*, supra, pág. 668. Véase *Canales v. Pan American*, supra. Es una cuestión de hecho que no se sustenta con la mera alegación del reclamante, sino que hace falta aportar prueba, la cual deberá ser valorada exclusivamente por el juez de instancia. A. De Cossio y Corral, *El Dolo en el Derecho Civil*, Madrid, 1955, pág. 353; J. Manresa, *Comentarios al Código Civil Español*, Madrid, 1967, T. VIII, Vol. 1, pág. 218.

Sin embargo, entendemos que aunque la determinación de si se actuó o no dolosamente requiere una acción afirmativa del que reclama la existencia de dolo, no es necesario que utilice el vocablo "dolo" en su alegación. Bastará ver la naturaleza de la reclamación para determinar si se imputa una conducta dolosa. Al respecto, véase *Muñiz de León v. Melón Hnos. & Cía.*, 56 D.P.R. 330 (1940). En el citado caso, fundamentado en una reclamación de daños proveniente de un embargo ilegal, se acudió ante nos, señalando como error el que en ninguna de las causas de acción invocadas por el demandante se había alegado ma-

---

([30]) Puig Peña, *op. cit.*, pág. 165.

licia, falta de causa probable, mala fe, dolo, fraude o negligencia al trabar la demanda. Rechazamos dicho planteamiento y concluimos que los hechos alegados por el demandante eran suficientes para demostrar que los daños habían sido causados por la culpa o negligencia de la demandada y que no era necesario que el demandante utilizara las palabras "culpa" o "negligencia". No vemos razón para no aplicar igual norma en este caso. Por lo tanto, debemos determinar si de la naturaleza de las alegaciones del señor Betancourt, éstas eran suficientes para establecer claramente los elementos constitutivos del dolo en el cumplimiento de la obligación por parte de Hilton, al éste haber cancelado el contrato de consultoría y, por ende, impedido el ejercicio del derecho de opción.

De la prueba documental ante nos,[31] prueba a base de la cual el T.P.I. y el T.C.A. fundaron su determinación, vemos que, como cuestión de hecho, el señor Betancourt presentó una reconvención contra Hilton a raíz de la demanda incoada por este último, la cual versaba sobre el contrato de administración otorgado por las partes. En sus alegaciones de la reconvención, el señor Betancourt adujo que Hilton había actuado de mala fe y solamente con el propósito de despojarlo de sus derechos legales e impedir que realizara lo pactado en el *acuerdo de administración.* Añadió que Hilton fraudulentamente lo engañó, haciéndole creer que no estaba capacitado legalmente para *administrar* el casino. Alegó, en la alternativa, que mediando mala fe y fraudulentamente, lo obligaron a suscribir un segundo contrato (contrato de consultoría), bajo unos términos y condiciones diferentes que lo pusieron en una posición desventajosa comparada con las negociaciones logradas en el

---

[31] Como regla general, un tribunal apelativo no podrá alterar las conclusiones de hecho de un tribunal inferior a menos que éstas sean claramente erróneas. Sin embargo, sí se podrán alterar las conclusiones de hecho cuando éstas estén fundamentadas únicamente en prueba documental o en testimonio pericial. Véase *Morán v. Gracia,* 106 D.P.R. 155 (1977).

contrato anterior (contrato de administración).([32]) El señor Betancourt hizo referencia en la reconvención al contrato de consultoría otorgado por las partes, haciendo constar su existencia, vigencia y la opción de renovar contenida en éste. Posteriormente, como consecuencia de la cancelación unilateral del contrato de consultoría, el señor Betancourt presentó una moción para someter una enmienda a las alegaciones para particularizar la alegación de daños. En esta moción, el señor Betancourt solicitó que se ordenara el cumplimiento específico del contrato o, en la alternativa, se condenara a los demandantes reconvenidos al pago de los daños ocasionados por el incumplimiento del contrato. A esos efectos, señaló:

> Específicamente, la compareciente interesa suplementar el párrafo A de la Súplica de la Reconvención, … para eliminar su solicitud de cumplimiento específico y particularizar su reclamación de daños por incumplimiento de forma que lea como sigue:
> A. [S]e solicita de este Honorable Tribunal que dicte sentencia condenando … a responder de forma mancomunada y solidaria por los daños causados por el menoscabo o incumplimiento de las obligaciones contractuales incurridas bajo el "Casino Consultant Agreement". …([33])

Es en fecha posterior, mediante una moción para solicitar que se dictara sentencia sumaria, que el señor Betancourt hace referencia a la actuación dolosa de Hilton en relación con el cumplimiento con el contrato de consultoría, al argüir que "[l]a actuación unilateral de Hilton dando por terminado el contrato al finalizar el cuarto año, impidió que se cumpliera el término de cinco años, pretendiendo con ello, evadir la obligación de renovar el contrato, a opción del Sr. Betancourt".([34])

---

([32]) Contestación a la demanda y reconvención, pág. 11. Apéndice del recurso de *certiorari*, pág. 110.

([33]) Moción sometiendo enmienda a las alegaciones, pág. 2. Apéndice del recurso de *certiorari*, pág. 140.

([34]) Moción solicitando que se dicte sentencia sumaria, pág. 5. Apéndice del recurso de *certiorari*, pág. 209.

El señor Betancourt alega ante nos que en la citada reconvención se alegó mala fe y dolo por parte de Hilton en el cumplimiento de sus obligaciones contractuales. Añade que la moción para someter una enmienda a las alegaciones específicamente incorporó las alegaciones de mala fe y dolo contractual en la privación de los derechos del señor Betancourt al ejercitar la opción de extender el contrato de consultoría. No podemos coincidir con sus argumentos. Una evaluación de los documentos en cuestión nos hacen concluir que las alegaciones sobre la conducta dolosa de Hilton, esbozadas en la reconvención, versaban sobre el cumplimiento del contrato de administración, mas no sobre el contrato de consultoría. Pese a que hubo una enmienda a las alegaciones de la reconvención, se especificó que la enmienda era a los efectos de alterar la súplica para reclamar indemnización por el incumplimiento del contrato de consultoría.[35] Esto no equivale a una alegación de dolo. Una conclusión en contrario sería un ejercicio extremadamente forzado.

Rechazamos, además, la posibilidad de una enmienda a las alegaciones mediante una moción de sentencia sumaria. Al respecto, el tratadista Cuevas Segarra entiende que contraviene las Reglas de Procedimiento Civil el entender enmendadas las alegaciones por vía de una moción de sentencia sumaria o de desestimación. Refiriéndose a éstas, opina:

> Tales mociones no pueden considerarse, ni son alegaciones permitidas dentro del significado de la Regla 5.1 y 13 de Pro-

---

[35] Reclamó las sumas siguientes:

1. Principal adeudado por servicios prestados desde el 1ro de enero de 1989 al 31 de enero de 1993, y sus intereses.

2. Principal adeudado por honorarios de febrero a diciembre de 1993 y sus intereses.

3. Valor estimado al 31 de diciembre de 1994 de honorarios durante 1994 a 1998, bajo la opción otorgada en el contrato de consultoría, de renovarlo durante cinco años.

4. La suma de un millón de dólares ($1,000,000) por los daños causados.

cedimiento Civil. Más aun, cuando rige el principio invertebrado de que las alegaciones no constituyen prueba, por lo que tampoco podrían tener el efecto de considerarse enmendadas para conformarlas con una prueba inexistente.[36]

Así pues, descartamos a su vez el planteamiento del señor Betancourt a los efectos de que, en la alternativa, hubo una enmienda a las alegaciones con la prueba. En efecto, la Regla 13.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone para que, aun en el supuesto de ausencia de una enmienda formal, "[c]uando con el consentimiento expreso o implícito de las partes se someta *a juicio* cuestiones no suscitadas en las alegaciones, aquellas se considerarán a todos los efectos como si se hubieran suscitado en las alegaciones". (Énfasis suplido.)

Entendemos que dicho supuesto aplica a situaciones en las cuales se hacen nuevas alegaciones durante el juicio o la vista en su fondo, mas no a situaciones como la de autos, cuyos hechos y controversias fueron evaluados y adjudicados sumariamente. En vista de lo anterior, forzoso es concluir que el señor Betancourt no hizo una oportuna alegación de dolo en el cumplimiento del contrato de consultoría y, por lo tanto, erró el foro recurrido al confirmar la determinación de que Hilton había incurrido en dolo contractual.

Dado a lo antes expuesto, resulta inconsecuente la discusión de los errores segundo y tercero.

## IV

Como último error, Hilton cuestiona la actuación del foro recurrido al sostener la determinación del T.P.I. de nombrar un Comisionado Especial para llevar a cabo la determinación del monto de la compensación adeudada al

---

[36] J.A. Cuevas Segarra, *Tratado de Derecho Procesal Civil*, San Juan, Pubs. JTS, 2000, T. I, págs. 323–324.

señor Betancourt y disponer que la determinación del Comisionado sería final.

■■■ La designación y facultades de un Comisionado Especial están recogidas en las Reglas 41.1–41.5 de Procedimiento Civil, 32 L.P.R.A. Ap. III. Éstas disponen que el tribunal en que esté pendiente un pleito o procedimiento podrá nombrar un Comisionado Especial en relación con dicho pleito o procedimiento. A manera de excepción, y no como norma general, esta regla permite que el tribunal encomiende a un Comisionado Especial un asunto, sólo si están involucradas cuestiones sobre cuentas y cómputos difíciles de daños o casos que involucren cuestiones sumamente técnicas o de un conocimiento especial altamente especializado. *Vélez Ruiz v. E.L.A.*, 111 D.P.R. 752 (1981).

La corrección del nombramiento de un Comisionado Especial se hace patente en el caso de autos, cuando observamos que, en cuanto a los mismos cómputos y aún contando con la asistencia del Comisionado Especial designado, las partes estuvieron enfrascadas en años de polémica sobre las partidas, cantidades, ingresos, débitos y demás cómputos necesarios para calcular las comisiones adeudadas al señor Betancourt por el incumplimiento de Hilton con el plazo original del contrato de consultoría.

Adoptamos la determinación hecha por el T.C.A. a los efectos de que el T.P.I. describió la función del Comisionado Especial como un ejercicio contable pericial, estableciéndose que su facultad sería final en cuanto a sus hallazgos y recomendaciones. En ningún momento el T.P.I. abdicó sus deberes ministeriales, ya que el tribunal siempre conserva la potestad de aceptar, modificar, rechazar en todo o en parte, las recomendaciones hechas por el Comisionado Especial designado, así como de recibir evidencia adicional o devolver el informe sometido por éste. El alegado error no se cometió.

## V

Por los fundamentos antes expuestos, confirmamos el dictamen del Tribunal de Circuito de Apelaciones en cuanto a la procedencia de la reclamación del derecho de opción por parte del recurrido y el nombramiento del Comisionado Especial. Revocamos la determinación sobre la existencia de dolo contractual por parte de Hilton. Se devuelve el caso al Tribunal de Instancia para la continuación de los procedimientos a tenor con lo aquí dispuesto.

*Se dictará sentencia de conformidad.*