Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES

| | | |
|---|---|---|
| ALICIA ÁLVAREZ GRILLET<br><br>Demandante Apelante<br><br>v.<br><br>DIVERSIFIED AND SPECIAL SERVICES, INC. Y OTROS<br><br>Demandada Apelada | KLAN202500097 | Apelación procedente del Tribunal de Primera Instancia, Sala Superior de Aguadilla<br><br>Civil Núm.:<br>AG2021CV01257<br><br>Sobre:<br>Incumplimiento de Contrato; Cumplimiento Específico y Daños y Perjuicios |

Panel especial integrado por su presidenta, la Juez Ortiz Flores, la Juez Brignoni Mártir y el Juez Candelaria Rosa.

Candelaria Rosa, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 26 de agosto de 2025.

Comparece la señora Alicia Álvarez Grillet (Apelante) vía *Apelación* y solicita que revoquemos la *Sentencia* del Tribunal de Primera Instancia, Sala Superior de Aguadilla, emitida el 27 de diciembre de 2024. En dicho dictamen, el foro recurrido declaró No Ha Lugar la demanda que presentó la Apelante en contra de Diversified and Special Services, Inc., el señor Agustín García Acevedo, su esposa, la señora Maribel Negrón, y la Sociedad Legal de Gananciales compuesta por ambos. Por los fundamentos que expondremos, confirmamos la *Sentencia* recurrida.

La controversia ante nuestra consideración trata de una demanda sobre incumplimiento de contrato, cumplimiento específico y daños y perjuicios. Surge del expediente que el 13 de julio de 2019, la señora

Número Identificador

SEN2025 _____

Álvarez Grillet y la empresa Diversified and Special Services, Inc. (Apelada o DSS) suscribieron un *Contrato de Compraventa Propiedad Horizontal* para el Apartamento A-4 del proyecto Mar-Bela Casa de Playa en el municipio de Isabela. El referido acuerdo dispone que, en caso de que la Apelante financie el balance del precio de compraventa, ésta se obliga a otorgar la escritura de hipoteca concurrentemente con el otorgamiento de la escritura de compraventa. También establece que la compradora deberá comparecer al lugar, sitio y hora propuesta por DSS y ante el notario público designado por ésta, previa notificación por correo certificado con acuse de recibo con no menos de 30 días de anticipación a la fecha del otorgamiento. El acuerdo dispone, además, que el término para firmar la escritura de compraventa no debe exceder de veinticuatro (24) meses desde la fecha de la firma del contrato de compraventa. En caso de que la Apelante, sin notificación escrita previa o causa justificada, se niegue o no acuda a la cita para la firma de la escritura de compraventa, la Apelada puede resolver el contrato. No es causa justificada la incapacidad de la Apelante para satisfacer las cantidades que debe pagar a DSS en o antes de la fecha de cierre.

Conforme a lo anterior, el 12 de septiembre de 2020, DSS le envió una carta a la Apelante en la que le notificó que la unidad que separó sería entregada próximamente, por lo que le solicitó la actualización de la documentación del banco. Además, le requirió que en el término de cinco (5) días entregara una carta actualizada de precualificación o una que informara que cuenta con los fondos suficientes para comprar sin financiamiento. De conformidad, el 5 de enero de 2021, la Apelante le envió la información solicitada.

Posteriormente, mediante correo electrónico y correo certificado, la Apelada citó a la señora Álvarez Grillet para inspección de la propiedad y el cierre y firma de la escritura de compraventa a finales del mes de marzo de 2021. Sin embargo, debido a las correcciones que solicitó la Apelante durante la primera inspección del inmueble, DSS aplazó el cierre y firma de la escritura de compraventa para el 8 de abril de 2021, previa coordinación de la señora Álvarez Grillet con el banco hipotecario. A su vez, la citó para la inspección final de la propiedad el 27 de marzo de 2021. La Apelante compareció a la inspección final e hizo nuevos señalamientos.

El 9 de abril de 2021, DSS envió al banco hipotecario Moneyhouse el permiso de uso para la continuación del trámite de financiamiento. En esa misma fecha, la Apelada le notificó a la señora Álvarez Grillet que envió todos los documentos que requirió Moneyhouse y que se corrigió lo señalado en la última inspección. No obstante, advirtió que no había recibido la tasación de la propiedad y que la falta de esta podía demorar el cierre de la compraventa. Por su parte, la Apelante le informó que el banco le solicitó documentos adicionales para otorgar el préstamo hipotecario.

Debido a la falta de tasación y a una fecha cierta para completar el financiamiento del inmueble, el 15 de abril de 2021, la Apelada le concedió a la señora Álvarez Grillet hasta el 19 de abril del mismo año como fecha final para el cierre y firma de la escritura de compraventa y el pago con cheque por el balance remanente de doscientos cuarenta y un mil con novecientos noventa dólares ($241,990). A su vez, advirtió que su incumplimiento conllevaría la cancelación del contrato de compraventa. El 29 de abril de 2021, la Apelada le concedió a la

Apelante hasta el 7 de mayo de 2021 como fecha final para que se presentara a firmar la escritura de compraventa y pagar el balance debido.

El 5 de mayo de 2021, la señora Álvarez Grillet le envió un correo electrónico a DSS en el que informa que el trámite en el banco ha continuado su curso. Sin embargo, notificó que debido a la tardanza en el procesamiento de su préstamo es "imposible" que se pueda firmar la escritura el 7 de mayo de 2021.

Así las cosas, el 13 de mayo de 2021, DSS notificó a la señora Álvarez Grillet la cancelación de su contrato de compraventa, suscrito el 13 de julio de 2019. Inconforme, esta presentó la demanda de epígrafe el 14 de diciembre de 2021. Alegó que DSS canceló unilateralmente el contrato de compraventa que suscribió antes de que transcurriera el término de veinticuatro (24) meses dispuesto en el acuerdo para que se finalizara el negocio jurídico. Ello, con el propósito de vender a un tercero el inmueble en controversia a un precio mayor al que originalmente pactó con DSS. Por su parte, DSS presentó su *Contestación a Demanda y Reconvención*, en la que negó la mayoría de las alegaciones en su contra.

Luego de varias incidencias procesales y después de celebrar el juicio en su fondo los días 28, 29 y 30 de octubre de 2024, el 27 de diciembre de 2024, el Tribunal apelado declaró No Ha Lugar la demanda contra todos los codemandados. A su vez, desestimó la reconvención que presentó la Apelada por falta de prueba que sustentara las alegaciones. Oportunamente, la Apelante presentó una *Solicitud de Reconsideración y para que se hagan Determinaciones de*

*Hechos Adicionales* que el foro recurrido declaró No Ha Lugar el 23 de enero de 2025.

Todavía en desacuerdo, la señora Álvarez Grillet acudió ante este Tribunal mediante el recurso de epígrafe. En resumen, señaló que el Tribunal de Primera Instancia erró en la apreciación de la prueba, al declarar No Ha Lugar la demanda que presentó en contra de DSS, por causa de la denegación del préstamo hipotecario el 23 de junio de 2021. Ello, a pesar de que notificó que tenía el dinero para pagar el balance adeudado y que el contrato de compraventa aún no había vencido. También, señaló que el foro apelado incidió al no incluir las determinaciones de hechos contenidas en su *Solicitud de Reconsideración* […], ya que estas constituyen hechos probados cuyo efecto era una sentencia a su favor.

Después de examinar la totalidad del expediente, advertimos que la controversia ante nuestra consideración surgió bajo la vigencia del Código Civil de 1930, derogado. Por tal razón, haremos referencia a las normas sobre derecho contractual establecidas en dicho cuerpo de normas. Art. 1808 del Código Civil de 2020, 31 LPRA sec. 11713. Revisemos su alcance.

Los contratos existen desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Artículo 1206 del Código Civil, 31 LPRA sec. 3371; *Amador v. Conc. Igl. Univ. de Jesucristo*, 150 DPR 571 (2000). Por tanto, la existencia de un contrato requiere (a) el consentimiento de los contratantes; (b) objeto cierto que sea materia del contrato; y (c) causa de la obligación que se establezca. Artículo 1213 del Código Civil, 31 LPRA sec. 3391; *Díaz Ayala et al. v. E.L.A.*, 153 DPR 675 (2001).

En tanto, el contrato de opción a compra es un tipo contractual no regulado por el Código Civil, cuyos contornos han sido delineados por la jurisprudencia y definido como "el convenio por el cual una parte (llamada concedente, promitente u optatario) concede a la otra (llamada optante), por tiempo fijo y en determinadas condiciones, la facultad, que se deja exclusivamente a su arbitrio, de decidir respecto a la celebración de un contrato principal". *P.D.C.M. Assoc. v. Najul Bez*, 174 DPR 716, 724 (2008), citando a *Mayagüez Hilton Corp. v. Betancourt,* 156 DPR 234, 246 (2002); véase también *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713 (2001).

Dicho contrato otorga al optante la facultad de determinar si perfecciona o no el contrato definitivo dentro del plazo concedido. El contrato de opción tiene los siguientes elementos esenciales: "(1) se concede al optante la facultad de decidir unilateralmente si celebrará el contrato principal (la compra y venta) sin ninguna obligación por parte de éste; (2) dicha concesión tiene carácter de exclusividad; (3) se establece un plazo para ejercitar la opción; y (4) no existe otra condición que no sea la voluntad del optante." *S.L.G. Irizarry v. S.L.G. García*, *supra*, pág. 722. Consecuentemente, esta clase de contrato queda extinguido si transcurre el plazo concedido sin que el optante ejerza la opción y se estima entonces caducado. *Mayagüez Hilton Corp. v. Betancourt*, *supra*.

Naturalmente, el contrato de opción se rige por las normas generales de las obligaciones y contratos. *Matos, González v. S.L.G. Rivera-Freytes*, 181 DPR 834 (2011); *Pérez v. Sampedro*, 86 DPR 526 (1962). Por tanto, aquí, igual que en todo contrato, cuando concurren las condiciones esenciales para su validez el contrato resulta obligatorio

para las partes. Artículo 1230 del Código Civil, 31 LPRA sec. 3451. Es cierto que los contratantes pueden establecer los pactos, cláusulas y condiciones que tengan por conveniente, siempre que no sean contrarios a las leyes, a la moral, ni al orden público. Artículo 1207 del Código Civil, 31 LPRA sec. 3372; *S.L.G. Irizarry v. S.L.G. García*, *supra*; *Trinidad v. Chade*, 153 DPR 280 (2001). No obstante, lo fundamental es que las obligaciones que nacen del contrato tienen fuerza de ley entre las partes y deben cumplirse al tenor de los mismos. Artículo 1044 del Código Civil, 31 LPRA sec. 2994. Por ello, en ausencia de ambigüedad o confusión en el lenguaje o contenido contractual, se interpretará sus cláusulas en el sentido literal. Art. 1233 del Código Civil, 31 LPRA sec. 3471.

Cuando no es posible determinar la intención de los contratantes con la mera lectura de las cláusulas del contrato, solo entonces deberá recurrirse a evidencia extrínseca para determinarla. *Nissen Holland v. Genthaller*, 172 DPR 503 (2007). Por ello, se ha resuelto que el alcance de un acuerdo de opción no se puede fijar sin tomar en cuenta el contenido específico del contrato. *Zeta Enterprieses, Inc. V. ELA*, 145 DPR 1 (1998).

Después de un minucioso y detenido examen de las alegaciones de las partes, el contrato y la prueba contenida en el expediente, no albergamos duda de que el incumplimiento que reclama la señora Álvarez Grillet corresponde únicamente a su falta de comparecencia a las citas notificadas por DSS para completar el cierre y firma de la escritura de compraventa. Al examinar la cláusula 40 (b) del contrato suscrito surge con claridad que DSS podía resolver el acuerdo si el comprador "sin notificación escrita previa y causa justificada, […] no

acude a su cita para la firma de la escritura de compraventa, después de habérselo requerido la VENDEDORA por escrito por correo certificado […]". En el mismo inciso, añade que "[n]o se considera causa justificada que excuse al COMPRADOR […] su inhabilidad para satisfacer las cantidades que debe pagar en o antes de la fecha de cierre".

Ciertamente, la señora Álvarez Grillet no acudió a las citas que le notificó DSS para el cierre de la compraventa en más de una ocasión. De la prueba se desprende que la Apelada aplazó varias veces la fecha para la firma de la escritura dentro del plazo de veinticuatro (24) meses que tenían las partes para concretar la compraventa. Sin embargo, la única justificación que proveyó la Apelante para no acudir a la última cita pautada para el 7 de mayo de 2021 fue que era "imposible pensar que las escrituras se realicen en Viernes Mayo 7, con el préstamo en proceso y con el reporte del tasador pendiente". Indiscutiblemente, esto no constituye causa justificada que la eximiera de cumplir con su obligación según se pactó en el contrato.

Cabe señalar que, mediante la cláusula veinticinco (25) del contrato, la señora Álvarez Grillet se obligó a no incurrir en dilaciones "y que si faltare a la citación que se le hiciere para el otorgamiento de las escrituras sin causa justificada […]", DSS podía dar por terminado el contrato por abandono del mismo.

No hay duda de que la prueba documental y testifical examinada demostró el incumplimiento de la Apelante con sus obligaciones que conllevó la cancelación del contrato. No solo admitió que no entregó los documentos solicitados por DSS en septiembre de 2020, sino que reconoció que no tenía el dinero para el cierre del préstamo hipotecario

en las fechas en que fue citada.[1] Por consiguiente, su alegación de que contaba con el dinero para la compra de la propiedad es inmeritoria. No solo lo reconoció, sino que tampoco hallamos prueba en el expediente que demostrara que la señora Álvarez Grillet contaba con los fondos para el pago del balance adeudado.

Finalmente, la Apelante alega que fue citada en varias ocasiones para el cierre y firma de la escritura de compraventa sin que DSS le informara el lugar, la hora y el notario que lo llevaría a cabo. Sin embargo, surge que este error no fue planteado ante el Tribunal de Primera Instancia. Por tanto, estamos impedidos de dirimir dicho señalamiento. Cabe señalar que nuestro ordenamiento apelativo ha establecido que la función revisora de los tribunales apelativos está limitada a asuntos que hayan sido planteados o resueltos por el foro apelado. *Abengoa, S.A. v. American Intl. Ins.*, 176 DPR 512 (2009).

Por los fundamentos expresados, confirmamos la *Sentencia* recurrida.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

---

[1] Transcripción de la Prueba Oral, en adelante TPO, de la vista celebrada el 28 de octubre de 2024, págs. 282 y 284, líneas 1-25; pág. 358, líneas 1-20.