ESTADO LIBRE ASOCIADO DE PUERTO RICO
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| | | |
|---|---|---|
| **MARCO HERRERA BATISTA y SUNHEIR ROMÁN CINTRÓN y la SLG compuesta por ambos**<br><br>Demandantes<br><br>v.<br><br>**PDCM ASSOCIATES, S.E.; A y B Compañía de Seguros; C y D**<br><br>Demandados | KLAN202400572 | **APELACION** procedente del Tribunal de Primera Instancia, Sala Superior de **Caguas**<br><br>Civil Núm.:<br>**SJ2021CV03903**<br>**CG2021CV02098**<br><br>Sobre:<br>Desahucio |
| **PDCM ASSOCIATES, S.E.**<br><br>Apelante -Demandante<br><br>v.<br><br>**MARCO HERRERA BATISTA et al.**<br><br>Apelados-Demandados | | |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio, el Juez Marrero Guerrero y la Jueza Boria Vizcarrondo.

Boria Vizcarrondo, Jueza Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 13 de septiembre de 2024.

Comparece ante nos, mediante *Escrito de Apelación,* PDCM Associates SE (PDCM o Apelante) y nos solicita que revoquemos la *Sentencia* emitida el 13 de marzo de 2024 por el Tribunal de Primera Instancia, Sala Superior de Caguas (TPI).[1] Mediante esta *Sentencia,* el TPI declaró Ha Lugar a la *Demanda Sobre Incumplimiento de Contratos*[2] presentada por el señor Marco Herrera Batista (Sr.

---

[1] Apéndice del *Escrito de Apelación,* Anejo I, págs. 1-8. Notificada y archivada en autos el 13 de marzo de 2024.
[2] *Íd.,* Anejo VII, págs. 64-66.

Herrera), No ha Lugar a la *Demanda Sobre Desahucio*[3] presentada por PDCM e indemnizó a PCM al pago de daños.

Por los fundamentos que discutiremos a continuación, confirmamos la *Sentencia* recurrida.

**I.**

El 23 de febrero de 2001, PDCM firmó un *Contrato de Arrendamiento* (*Contrato*) con Subway Real Estate LLC (Subway Real Estate) con el propósito de arrendar un espacio comercial localizado en Plaza del Carmen Mall en Caguas.[4] El 21 de junio de 2016, Subway cedió su participación en el *Contrato* al Sr. Herrera, la señora Suheir Román Cintrón (Sra. Román) y la Sociedad Legal de Gananciales compuesta por ellos, quienes procedieron a operar el negocio ahí ubicado.[5]

La Cláusula 18 del *Contrato* dispone que:

18. REPAIRS:

The ordinary repairs of the location leased such as: unplugging drains, painting interiors, replacing windows, and others are the responsibility of and are to be paid by the Tenant. **Structural repairs of the buildings of the shopping center, *including cracks and leaks* are the responsibility of and are to be paid by the Landlord except when said faults are caused by negligent acts of the Tenant**.[6]

Conforme lo contratado, PDCM estaba obligado a costear y reparar los daños estructurales del inmueble, como grietas y filtraciones, y el Sr. Herrera, los daños ordinarios como limpieza de drenaje, pintar paredes interiores y remplazar ventanas, entre otros. Según la prueba ventilada y creída por el TPI, en cuatro ocasiones, el 7 de julio de 2020, el 31 de julio de 2020, el 20 de noviembre de 2020 y el 16 de diciembre de 2020, el Sr. Herrera le envío correos electrónicos a los representantes de PDCM, informándoles de una filtración en el techo del local objeto de arrendamiento. En esta

---

[3] *Íd.*, Anejo V, págs. 38-40.
[4] *Íd.*, Anejo VI, págs. 41-63.
[5] *Íd.*, Anejo XII, pág. 82.
[6] *Íd.*, Anejo VI, págs. 47-48. (Énfasis nuestro).

última comunicación, incluyó fotos de los daños causados al interior del negocio. Posteriormente, el 16 de febrero de 2021, intentó comunicarse nuevamente. Según el Sr. Herrera, hubo más de quince (15) intentos de comunicarse con PDCM y resolver el problema de filtración en el techo del negocio.[7]

A pesar de los intentos de comunicación por parte del Sr. Herrera, PDCM no resolvió el problema de filtración. Así las cosas, el 5 de mayo de 2021, Subway le envió una comunicación a PDCM exigiendo el cumplimiento con el *Contrato* y el reparo de las filtraciones. Para aquella fecha, los daños físicos ascendían a $8,334.37. A finales de mayo de 2021, el Sr. Herrera sostuvo una reunión con PDCM donde solicitó el arreglo de las filtraciones y ofreció hacer el pago correspondiente en concepto de arrendamiento. Ambos intentos fueron rechazados o ignorados por PDCM.

Ante los intentos infructuosos del Sr. Herrera para exigir cumplimiento con el *Contrato* y la falta de comunicación por parte de PDCM, el 23 de junio de 2021, el Sr. Herrera presentó una *Demanda* por incumplimiento contractual en contra de PDCM, consignando los cánones de arrendamiento debidos.[8] Posterior a ello, el 19 de agosto de 2021, PDCM presentó una *Demanda* de desahucio en contra del Sr. Herrera.[9]

El 11 y 12 de abril de 2023, el TPI celebró vistas en las que las partes tuvieron la oportunidad de presentar testigos. El 11 de abril de 2023, testificó el Sr. Herrera. Este testificó que es dueño de dos tiendas de Subway, ambas localizadas en Caguas.[10] En particular, la tienda Subway localizada en Plaza del Carmen Mall generaba entre $8,700.00 a $9,500.00 en ventas semanales.[11] Testificó que luego del paso del Huracán María en el 2017, tuvo que

---

[7] *Íd.*, Anejo XII, pág. 79.
[8] *Íd.*, Anejo VII, págs. 64-66.
[9] *Íd.*, Anejo V, págs. 38-40.
[10] *Transcripción de Vista en su Fondo 11 de abril de 2023*, pág. 22.
[11] *Íd.*, pág. 23.

invertir más de $200,000.00 de su peculio, para remodelar y reparar sus negocios.

Además testificó que Subway Real Estate, dueño original del *Contrato*, realizaba evaluaciones de auditoría del negocio del Sr. Herrera y que la desaprobación de estas evaluaciones podría resultar en la cancelación de la franquicia.[12] Por lo tanto, el Sr. Herrera tuvo que costear las reparaciones de los daños ocasionados al negocio por las filtraciones, para mantener la calidad requerida, incluyendo reemplazar los plafones de techo, limpiar la tienda, mover mercancía del área afectada, pegar los papeles despegados y tapar los "gypsum boards" humedecidos.[13] Estos daños fueron recurrentes puesto que la filtración no fue corregida.

Pese todos los intentos de comunicación con PDCM, y el conocimiento de PDCM de las filtraciones, no fue hasta el 2022 que este realizó gestiones para reparar el problema.[14] Finalmente, el Sr. Herrera testificó sobre los daños emocionales que le ocasionó la filtración en su negocio y la negativa de atender el reclamo por parte de PDCM. Testificó que:

> Nosotros con mucho sacrificio en el 2016 compramos la tienda. Vino María y lo que estábamos construyendo nos lo destruyó. A fuerza de préstamos y dinero de nosotros remodelamos la tienda. Y lo hicimos con mucho orgullo. Haber remodelado esa tienda en el 2018, después de María, tenía un significado especial, porque significaba la recuperación de nosotros. Y ha sido duro. Ha sido duro porque uno trabaja todos los días. Se levanta todos los días a echar para adelante.
>
> Y una tienda que debería estar vendiendo mucho más de lo que está vendiendo hoy, pues no llegamos porque la apariencia no es bonita. Y está probado que la gente va a los sitios cuando son bonitos, cuando son agradables de estar. El estresor de las inspecciones de Subway, tanto a mí como a los empleados nos da mucha ansiedad, mucho estrés, porque hay implicaciones de no tener la tienda al día. El estresor financiero. O sea, después de haber visto la tienda tan bonita como quedó. Ahí están las fotos. Tuvimos una publicación en El Nuevo Día. Fuimos la segunda tienda en Puerto Rico

---

[12] *Íd.*, pág. 37.
[13] *Íd.*, págs. 37 y 72.
[14] *Íd.*, págs. 49-51.

que se remodeló bajo el nuevo estándar de Subway, y con mucha honra lo hicimos.

Entonces, verla como está, y haber intentado – el haber tenido que llegar aquí innecesariamente – porque esto en un principio era una cosa sencilla de resolver. O sea, era cuestión de limpiar el techo, darle el tratamiento y darle una pinturita a los sitios de humedad que había. Pero, o sea, el tener que estar escribiendo, llamando, tuve este estrés legal innecesario. O sea, esto se podía resolver sin tener que llegar aquí. Gastos de abogados, gastos – no. Realmente es un estresor innecesario. Yo quisiera estar enfocado en mi negocio, creando empleos.[15]

Además del Sr. Herrera, testificó el señor Jorge Pérez Chacón, especialista en cobros de PDCM. Él testificó que al momento del juicio, según el "*ledger*", el Sr. Herrera debía cuarenta y cinco mil seiscientos setenta y nueve dólares con veintiocho centavos ($45,679.28) en concepto de arrendamiento no pagado.[16] No obstante, el señor Pérez reconoció que la cantidad consignada en el tribunal era en exceso a la cantidad adeudada en el "*ledger*".[17]

El 12 de abril de 2024, testificó el señor Pedro Luis Montalvo Pérez (Sr. Montalvo), presidente de la compañía de contratista general MEG Solutions, LLC.[18] Dicha compañía tenía amplia experiencia con la remodelación, construcción y reparación de tiendas Subway, habiendo trabajado con Subway Real Estate desde el 2004.[19] Su testimonio vertió sobre los daños ocasionados por la filtración, estimando el costo de la reparación por los daños en veinticinco mil diecinueve dólares con veinticinco centavos ($25,019.25).[20]

Habiendo recibido el testimonio del Sr. Herrera, Sr. Pérez y del Sr. Montalvo, los argumentos de las partes y ventilado la prueba, el 13 de marzo de 2024, el TPI emitió su *Sentencia*. En esta, declaró No Ha Lugar a la *Demanda Sobre Desahucio* presentada por PDCM

---

[15] *Íd.*, págs. 54-56.
[16] *Íd.*, pág. 84.
[17] *Íd.*, pág. 91.
[18] *Transcripción de Vista en su Fondo 12 de abril de 2024*, págs. 7-8.
[19] *Íd.*, págs. 8-9.
[20] *Íd.*, pág. 13.

y Ha Lugar a la *Demanda Sobre Incumplimiento Contractual* instada por el Sr. Herrera.

En cuanto a la causa de acción por desahucio, el TPI sostuvo que, a fines de mayo de 2021, el Sr. Herrera compareció a una reunión con el licenciado Félix M. Román Carrasquillo, representación legal de PDCM, e hizo una oferta de pago por los cánones de arrendamiento pendientes. En esa reunión el pago fue rechazado y PDCM se negó a resolver el problema de la filtración.[21] El TPI resaltó que fue PDCM que no aceptó el pago de arrendamiento, que se instó la *Demanda Sobre Incumplimiento Contractual* antes que la *Demanda Sobre Desahucio* y que, con la radicación de la *Demanda Sobre Incumplimiento Contractual,* el Sr. Herrera consignó el dinero adeudado por el arrendamiento. Finalmente, PDCM no objetó la consignación de fondos. Interpretando lo resuelto por el Tribunal Supremo de Puerto Rico en *Campos v. Tribunal Superior,* 75 DPR 370 (1953), al no haberse opuesto a la consignación de fondos en aquel momento, PDCM renunció a que se dicte una sentencia resolutoria ordenando el desahucio, "ya que no puede dictarse una sentencia basada en la falta de pago". *Íd.,* pág. 378.

Por otro lado, al no haber cumplido con una obligación expresamente pactada en el *Contrato,* particularmente la Cláusula 18, PDCM incurrió en incumplimiento contractual. Al entender que la oposición de PDCM a la *Demanda Sobre Incumplimiento Contractual* carecía de méritos, le impuso temeridad. Finalmente, determinó que su incumplimiento le ocasionó daños al Sr. Herrera, por lo que ordenó el pago de $25,019.5 por concepto de daños provocados por las filtraciones, $18,200.00 por pérdida de ventas por dos semanas de cierre de operaciones mientras se corregía la

---

[21] *Transcripción de 11 de abril, supra,* pág. 67.

filtración, $25,000.00 a favor del Sr. Herrera por concepto de angustias mentales y $10,000.00 por concepto de honorarios de abogado por temeridad.

Inconforme con esta determinación, el 10 de julio de 2024, PDCM presentó el *Escrito de Apelación* ante nuestra consideración. En dicha comparecencia, hizo los siguientes señalamientos de error:

**PRIMER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL INDICAR QUE PDCM SE ALLANÓ A LA CONSIGNACIÓN DE LA TOTALIDAD DE LOS CÁNONES DE ARRENDAMIENTO REALIZADOS POR EL SEÑOR HERRERA Y QUE PDCM NO OBJETÓ LA CONSIGNACIÓN DE LA RENTA EN EL TRIBUNAL. PDCM NO SOLICITÓ EL RETIRO DE LOS FONDOS CONSIGNADOS.**

**SEGUNDO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR LAS CONCLUSIONES DE DERECHO SOBRE EL DESAHUCIO YA QUE SON CONTRADICTORIAS CON LOS HECHOS.**

**TERCER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO CONCEDER VALOR PROBATORIO A LOS TESTIMONIOS DE PDCM.**

**CUARTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER LA SUMA CONCEDIDA POR DAÑOS YA QUE LA PRUEBA TESTIFICAL Y DOCUMENTAL NO SUSTENTA LA DETERMINACIÓN DE HECHOS NÚMERO 18, 19, 20 Y 21 DE LA SENTENCIA YA QUE NO SE DESFILÓ PRUEBA DOCUMENTAL NI PERICIAL QUE SUSTENTARA LOS DAÑOS OTORGADOS.**

**QUINTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL IMPONERLE AL DEMANDADO-APELANTE LA CUANTIOSA SUMA DE $10,000.00 POR CONCEPTO DE HONORARIOS DE ABOGADO POR DEFENDER SU CAUSA ANTE EL FORO JUDICIAL EN BUSCA DE UNA DETERMINACIÓN JUSTA.**

**II.**

**A.**

"[L]a sentencia que dicta un Juez de Primera Instancia es el producto final de un activo y complejo proceso forense". L. Rivera Román, *La apreciación de prueba en el Tribunal de Primera Instancia y en el Tribunal de Apelaciones* en *Perspectivas en la práctica apelativa*, San Juan, Ed. SITUM, 2018, pág. 101. Estas gozan de

una presunción de corrección y la parte que impugne una determinación del Tribunal de Primera Instancia tiene el peso de la prueba para refutarla. *Íd.*

En vista de lo anterior, los foros apelativos debemos brindar deferencia a las determinaciones de hechos formuladas por el tribunal de instancia. *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 740 (2007). Esta deferencia yace en que el foro primario está en mejor posición que un tribunal apelativo para realizar la determinación de credibilidad. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 771 (2013). Se le impone un respeto a la labor del tribunal de instancia en aquilatar la credibilidad, dado que los foros apelativos sólo poseemos récords mudos e inexpresivos. *Ramírez Ferrer v. Conagra Foods PR*, 175 DPR 799, 811 (2009); *Pérez Cruz v. Hospital La Concepción*, 115 DPR 721, 728 (1984). Pues, en gran medida, la determinación de credibilidad depende de observar la manera en que la persona testigo declara, apreciar sus gestos, titubeos, contradicciones, entre otros factores que van formando gradualmente la convicción en cuanto a la verdad en la conciencia de la persona juzgadora. *Suárez Cáceres v. Com. Estatal Elecciones*, 176 DPR 31, 67-68 (2009).

Cónsono con lo anterior, la Regla 42.2 de Procedimiento Civil, 32 LPR Ap. V, R. 42.2, dispone que "[l]as determinaciones de hechos basadas en testimonio oral no se dejarán sin efecto a menos que sean claramente erróneas, y se dará la debida consideración a la oportunidad que tuvo el tribunal sentenciador para juzgar la credibilidad de los testigos". De esta forma, en ausencia de error manifiesto, prejuicio, parcialidad o pasión, los tribunales apelativos no intervendremos con la apreciación de la prueba, la adjudicación de credibilidad ni las determinaciones de hechos efectuadas por el foro primario. *Ortiz Ortiz v. Medtronic*, 209 DPR 759, 778 (2022); *Sucn. Pagán Berrios v. UPR y otros*, 206 DPR 317, 336

(2021); *Santiago Ortiz v. Real Legacy et al.*, 206 DPR 194, 219 (2021).

Se incurre en prejuicio, parcialidad o pasión, cuando la persona juzgadora actúa motivada "por inclinaciones personales de tal intensidad que adopta posiciones, preferencias o rechazos con respecto a las partes o sus causas que no admiten cuestionamiento, sin importar la prueba recibida en sala e incluso antes de que se someta prueba alguna". *Dávila Nieves v. Meléndez Marín, supra*, pág. 782. Además, "el error manifiesto ocurre cuando el foro apelativo queda convencido de que se cometió un error, a pesar de que haya evidencia que sostenga las conclusiones de hecho del tribunal, porque existe un conflicto entre las conclusiones y el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida". *Ortiz Ortiz v. Medtronic, supra*, pág. 779.

De otra forma, únicamente se alterará el dictamen del tribunal de instancia en una circunstancia de error manifiesto cuando, de un examen detenido de toda la prueba, el foro apelativo esté convencido que la persona juzgadora descartó injustificadamente elementos probatorios importantes o fundó su criterio en testimonios de escaso valor o inherentemente improbables o increíbles. *C. Brewer PR, Inc. v. Rodríguez,* 100 DPR 826, 830 (1972). Por ello, nuestra facultad para sustituir el criterio del foro primario está limitada a las instancias en las que, a la luz de la prueba admitida, no existe base suficiente para apoyar su determinación. *Ortiz Ortiz v. Medtronic, supra.* Por otro lado, los tribunales apelativos nos encontramos en la misma posición del foro primario para evaluar la prueba documental o pericial que fundamentan las determinaciones de hecho. *Sucn. Rosado v. Acevedo Marrero,* 196 DPR 884, 918 (2016); *González Hernández v. González Hernández,* 181 DPR 746, 777 (2011).

**B.**

La obligación "consiste en el deber de realizar una prestación. Esta es la conducta que ha de seguir el obligado para extinguir la obligación mediante el correspondiente acto de cumplimiento". J. Puig Brutau, *Compendio de derecho civil*, 2ª ed. rev., Barcelona, Ed. Bosch, 1994, Vol. II, pág. 1. De particular interés a nuestro análisis son las obligaciones que nacen de los contratos.

Un contrato es el negocio jurídico entre dos o más personas donde las partes contratantes se obligan a dar, hacer o no hacer una cosa. El Artículo 1044 del Código Civil de 1930,[22] (30 LPRA sec. 2994) (Código Civil de 1930) dispone que "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse a tenor de los mismos". Los contratantes pueden exigir el cumplimiento específico con las cláusulas y condiciones pactadas. *Casera Foods v. E.L.A.*, 108 DPR 850 (1979). "Si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas". Código Civil de 1930, *supra*, Artículo 1233. Los contratantes se "obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la buena fe, al uso y a la ley". *Íd.*, Artículo 1210.

---

[22] Aunque el Código Civil de 1930 fue derogado tras la aprobación del Código Civil de 2020, Ley Núm. 55-2020, (31 LPRA sec. 5311 *et seq.*), hacemos referencia al Código Civil de 1930 puesto que estaba vigente al momento de los hechos del presente caso. Por su parte, el Artículo 1808 dispone que "[l]as acciones y los derechos nacidos y no ejercitados antes de la entrada en vigor de este Código, subsisten con la extensión y en los términos que le reconoce la legislación precedente, pero sujetándose, en cuanto a su ejercicio y procedimiento para hacerlos valer, a lo dispuesto en este Código". 31 LPRA 11713. Sobre este artículo, el tratadista Miguel R. Garay Aubán, propone abordar dos cuestiones, una de fondo y otra de procedimiento. Respecto a la cuestión de fondo sostiene que subsisten las acciones y derechos nacidos y ejercitados antes de la vigencia del nuevo, aun cuando este no los reconozca con respecto a los derechos adquiridos. En cuanto al asunto de procedimiento, el tratadista comenta que se refiere a la forma de hacer valer los derechos y acciones. Ante ello, si el derecho no se ha ejercitado se sigue el procedimiento si alguno del Código Civil del 2020, pero ello raramente tendría efectos prácticos, ya que son las Reglas de Procedimiento Civil las que determinan los procedimientos a seguir. M. R. Garay Aubán, *Código Civil 2020 y su Historial Legislativo*, 2ª ed. rev., San Juan, Ed. SITUM, 2021, T. V, pág. 374.

Cuando una parte no cumple lo pactado, incurre en incumplimiento contractual. "[L]a responsabilidad contractual se basa 'en el quebrantamiento de un deber que surge de un contrato expreso o implícito'. A través de las acciones *ex contractu* se vindican los daños acaecidos como consecuencia del incumplimiento de obligaciones previamente pactadas". *Rivera Sanfeliz et al. v. Jta. Dir. First Bank*, 193 DPR 38, 56 (2015) (citando a *Soc. de Gananciales v. Vélez & Asoc.*, 145 DPR 508, 521 (1998)).

Cuando ocurre un incumplimiento contractual, la parte incumplidora puede incurrir en un incumplimiento negligente o en un incumplimiento doloso. Ante un incumplimiento negligente, sólo responderá por los daños previsibles al momento de contratar. Por otro lado, en el caso del incumplimiento doloso, responderá por todo daño causado, aun el imprevisible. La profesora Margarita García Cárdenas reconoce que "[n]unca es tarea fácil establecer la distinción entre una actitud negligente y una dolosa. Pero el concepto de negligencia no incluye, por lo general, los conceptos de mala fe o fraude. Por el contrario, la negligencia es la dejadez, el descuido de las obligaciones". M. García Cárdenas, *El nuevo derecho de: obligaciones y contratos: Código Civil 2020*, 1ª ed. rev., San Juan, MJ Editores, 2021, pág. 305. En el incumplimiento doloso, el deudor, "por sus actuaciones o ausencias frente a las circunstancias particulares de cada caso, demuestra una insolencia hacia sus obligaciones contractuales". *Íd.*, pág. 312. En *Mayagüez Hilton v. Betancourt*, 156 DPR 234 (2002), el Tribunal Supremo determinó que "el dolo no implica, necesariamente, un designio malévolo del deudor, sino sólo conocimiento del hecho de su propio incumplimiento, consciente de que ha de afectar la expectativa del acreedor". *Íd.*, pág. 253.

## C.

El desahucio es el procedimiento especial de naturaleza sumaria que tiene como objetivo principal la recuperación de la posesión

material de una propiedad inmueble mediante el lanzamiento o expulsión del arrendatario o precarista que la detente. *Mora Dev. Corp. v. Sandín*, 118 DPR 733, 749-750 (1987); *C.R.U.V. v. Román*, 100 DPR 318, 321 (1971). Esta figura está regulada por los Artículos 620 a 634 del Código de Enjuiciamiento Civil, 32 LPRA secs. 2821-2838. El Artículo 621 del Código de Enjuiciamiento dispone que el desahucio procederá "contra los inquilinos, colonos y demás arrendatarios, los administradores, encargados, porteros o guardas puestos por el propietario en sus fincas, y cualquier otra persona que detente la posesión material o disfrute precariamente, sin pagar canon o merced alguna".

En el caso del incumplimiento con un contrato de arrendamiento, debemos acudir al Código Civil de 1930, *supra*. Mediante este contrato, una de las partes se obliga a dar a la otra el goce o uso de una cosa por tiempo determinado y precio cierto. *Íd.*, Artículo 1433. Conforme el Artículo 1445 del Código Civil de 1930, el arrendatario tiene el deber de pagar el precio del arrendamiento en los términos convenidos. Por lo tanto, una de las causas de la extinción del contrato de arrendamiento es el incumplimiento con el mismo. Dispone el Artículo 1459 que:

> El arrendador podrá desahuciar judicialmente al arrendatario por alguna de las causas siguientes:
>
> [...]
>
> **(2) Falta de pago.** — Falta de pago en el precio convenido.
>
> **(3) Infracción de las condiciones del contrato.** — Infracción de cualquiera de las condiciones estipuladas en el contrato.
>
> [...]

*Íd.*, Artículo 1459 (b) y (c).

En cuanto al arrendador, este tiene la obligación de efectuar las reparaciones necesarias para conservar la cosa en buen estado y garantizar su goce útil. "Son reparaciones necesarias aquellas que

la cosa necesite como consecuencia del transcurso del tiempo, del desgaste natural de la cosa, del uso normal y ordenado del arrendatario, del caso fortuito o fuerza mayor". J.R. Vélez Torres, *Curso de derecho civil: derecho de contratos*, 1ª ed. rev., San Juan, Ed. UIPR, 1990, T. IV, V. II, pág. 275; *Castro Anguita v. Figueroa*, 103 DPR 847, 852 (1975). Entiéndase, por lo tanto, que el arrendador no tiene como única obligación la entrega de la propiedad al arrendatario, sino debe garantizar el uso según su propósito.

Ahora bien, instado una acción de desahucio, la parte demandante no puede aceptar del arrendatario los pagos retrasados. De hacerlo, este estaría renunciando a su derecho de desahuciar al arrendatario. "Cuando el arrendador ha entablado procedimiento de desahucio alegando el no pago de ciertos cánones y acepta aquéllos y cánones posteriores al quebrantamiento del contrato, vigente dicho procedimiento de desahucio, ello equivale a una renuncia al derecho a desahuciar". *Morales v. Martínez*, 40 DPR 724, 729 (1930).

Por su parte, el Artículo 1130 del Código Civil de 1930, *supra*, dispone que "[s]i el acreedor a quien se hiciere el ofrecimiento de pago se negare sin razón a admitirlo, el deudor quedará libre de responsabilidad mediante la consignación de la cosa debida". Dicho de otra manera, cuando el acreedor rechaza el pago de lo debido, el deudor puede consignar aquel dinero en el tribunal. Si el acreedor acepta lo consignado, la consignación tendrá el efecto de que lo adeudado se considerará pagado.

> [L]a consignación surte el efecto liberatorio que persigue en dos instancias distintas, a saber: (1) mediante la aceptación de la cuantía consignada por parte del acreedor, o **(2) por vía de una declaración judicial a los efectos de que la consignación se realizó conforme a derecho. Para la concreción de esta última, el Tribunal deberá evaluar, entre otras cosas, el cumplimiento con los requisitos que el Código Civil dispone para el pago por consignación**.

*ASR v. Proc. Rel. Familia,* 196 DPR 944, 950 (2016). (Énfasis nuestro).

Los requisitos para que la deuda quede consignada son: (1) que se haya hecho una oferta de pago; (2) que la oferta de pago haya sido rechazada sin razón que la justifique; (3) que el deudor avise su intención de consignar; y, (4) que el deudor deposite la cantidad adeudada en la autoridad judicial correspondiente. *Íd.*, págs. 950-951; Artículos 1130-1131 del Código Civil de 1930, *supra*. Ahora bien, si el acreedor no acepta lo consignado, el deudor todavía podrá quedar liberado de su obligación si la autoridad judicial hace una declaración a los efectos de determinar que la consignación se hizo conforme a Derecho.

**D.**

El tratadista Puig Brutau define el daño como "todo menoscabo material o moral causado contraviniendo una norma jurídica, que sufre una persona y del cual haya de responder otra". J. Puig Brutau, *Compendio de derecho civil*, 2ª ed. rev., Barcelona, Ed. Bosch, 1994, Vol. II, pág. 627. (Citas omitidas). Nuestro ordenamiento jurídico reconoce dos clases de daños, los especiales y los generales. *Nieves Díaz v. González Massas*, 178 DPR 820, 845 (2010). "Los daños especiales se refieren a toda aquella pérdida que recae sobre los bienes objetivos, pues estos daños admiten una valoración económica debido a que impactan directamente el patrimonio del perjudicado. Mientras, los daños generales son los infligidos a las creencias, los sentimientos, la dignidad, la estima social o la salud física o psíquica del perjudicado". *Íd.* (Citas omitidas). Por lo tanto, el concepto de daños en nuestra jurisdicción es amplio y general, por lo que los tribunales no deben crear impedimentos indebidos al reclamo de daños y sólo aplicar aquellos reconocidos por ley. Lo importante para que prospere una alegación de daños es que la parte que los reclame los logre probar en un tribunal.

En cuanto a la culpa, nuestro Tribunal Supremo ha reconocido en varias ocasiones que esta es tan amplia como la conducta humana. *Reyes v. Sucn. Sánchez Soto,* 98 DPR 305, 310 (1970). "La culpa o negligencia es la falta del debido cuidado, que consiste en no anticipar ni prever las consecuencias racionales de un acto, o la omisión de un acto, que una persona prudente y razonable habría previsto en las mismas circunstancias". *Rivera v. S.L.G. Díaz,* 165 DPR 408, 421 (2005). Como es sabido, la conducta constituyente de culpa puede estar basada tanto en una acción como en una omisión. En los casos donde se alega que el daño fue causado por una omisión culposa, quien reclama debe demostrar que: 1) existe un deber de actuar y se quebrante esa obligación; y, 2) cuando de haberse realizado el acto omitido se hubiese evitado el daño. *Santiago v. Sup. Grande,* 166 DPR 796, 807 (2006).

### III.

Discutido el derecho aplicable, nos encontramos en posición de resolver los errores señalados. Por estar íntimamente relacionados, atenderemos los primeros dos errores en conjunto. PDCM nos señaló que el TPI erró al indicar que PDCM se allanó a la consignación de los pagos adeudados y no aplicar correctamente el derecho sobre el desahucio. No le asiste la razón.

El caso de autos no trata únicamente sobre una acción de desahucio, sino también de un incumplimiento contractual. Por lo tanto, no podemos analizar la falta de los pagos de arrendamiento por parte del Sr. Herrera en el vacío y sin contexto. Como surge de la prueba, antes del incumplimiento del Sr. Herrera, PDCM incumplió crasamente con su obligación contractual. Al PDCM no reparar las filtraciones en el techo del negocio del Sr. Herrera, según estaba obligado por la Cláusula 18 del *Contrato de Arrendamiento,* el Sr. Herrera sufrió daños físicos a su negocio. En consecuencia, el Sr. Herrera se vio obligado a costear las reparaciones para continuar sus

operaciones, generar ingresos y poder cumplir con sus obligaciones contractuales. No existe otra razón alegada o probada para la falta del pago de los cánones de arrendamiento que no fuese el incumplimiento de PDCM.

Así las cosas, el Sr. Herrera notificó a PDCM de las filtraciones y exigió que este cumpliera con su deber. Fue luego de haber notificado a PDCM de los daños que sufría y que este haya hecho caso omiso a su deber que el Sr. Herrera detuvo que los pagos. No obstante, en mayo de 2021, en una reunión con la representación legal de PDCM, el Sr. Herrera hizo una oferta de pago de lo adeudado, que fue rechazada por PDCM. Ante esto, el Sr. Herrera se vio obligado a instar la *Demanda Sobre Incumplimiento Contractual* en el caso de autos, simultáneamente anunciando su intención de consignar lo adeudado. Así lo hizo. Posteriormente, PDCM instó la *Demanda Sobre Desahucio.*

PDCM señala en su recurso apelativo que, al no solicitar el retiro de los fondos consignados, no se allanó a la consignación. No obstante, el Sr. Herrera quedó liberado de su obligación al haber consignado los fondos conforme al derecho aplicable. Al Sr. Herrera haber quedado liberado de su obligación, mediante una consignación válida, murió la causa de acción de desahucio instada por PDCM. La consignación válida de lo adeudado tiene el efecto de que la parte demandante en una acción de desahucio renuncie a la acción porque desapareció la base de dicha acción. Por lo tanto, no se cometieron los primeros dos errores.

Los próximos dos errores serán atendidos en conjunto al estar relacionados con la apreciación de la prueba y las determinaciones de hecho por parte del TPI. PDCM señaló que el TPI erró al no otorgarle valor probatorio a sus testigos y sustentar las determinaciones de hecho 18, 19, 20 y 21 sin haber desfilado prueba pericial o documental. Dichas determinaciones tratan sobre los daños sufridos por el Sr. Herrera.

Como hemos señalado, la apreciación de la prueba por parte del foro de instancia merece la mayor deferencia al haber sido ese foro el que vio, en primera instancia, el *demeanor* de los testigos y la conducta de las partes. Como Tribunal revisor, sólo debemos interferir con la apreciación de la prueba si surge error manifiesto de derecho, parcialidad o prejuicio por parte de aquel foro. En el caso de autos, PDCM no nos ha presentado razón alguna para resolver que el TPI erró en su apreciación de la prueba. Por otro lado, la Regla 110 (d) de Evidencia, 32 LPRA Ap. VI, R. 110 (d), dispone que "[l]a evidencia directa de una persona testigo que merezca entero crédito es prueba suficiente de cualquier hecho, salvo que otra cosa se disponga por ley". Para probar un hecho, incluyendo la ocurrencia de daños, no es necesario que se admite alguna otra prueba si el juzgador le mereció entera credibilidad al testimonio de un testigo. No importa que dicho testigo haya sido o no cualificado como perito.

En el caso de autos, tanto el Sr. Herrera, como el Sr. Montalvo, testificaron sobre los daños que había sufrido el negocio del Sr. Herrera a causa de la filtración. El Sr. Herrera, además, testificó de las angustias mentales que había sufrido, del estrés causado y del miedo que sintió al posiblemente perder su franquicia con Subway Real Estate, por causa de las filtraciones. El Sr. Montalvo, por su parte, testificó sobre la cotización que realizó y los daños que percibió en el negocio. En ambos casos, al TPI le mereció entera credibilidad a sus testimonios. Por lo tanto, no se cometieron los errores.

Finalmente, el quinto error señalado cuestiona que el TPI haya indemnizado a PDCM por temeridad.

En cuanto a la temeridad, nuestro Tribunal Supremo ha resuelto que esta implica "aquella conducta que haga necesario un pleito que se pudo evitar, que lo prolongue innecesariamente o requiera a la otra parte efectuar gestiones innecesarias". *Oliveras, Inc.*

*v. Universal Ins. Co.*, 141 DPR 900, 935 (1995). La conducta temeraria

consiste en:

> [U]na actitud que se proyecta sobre el procedimiento y
> que afecta el buen funcionamiento y la administración de
> la justicia. También sujeta al litigante inocente a la ordalía
> del proceso judicial y lo expone a gastos innecesarios y a
> la contratación de servicios profesionales, incluyendo
> abogados, con el gravamen a veces exhorbitante para su
> peculio.
> H. Sánchez, *Rebelde Sin Costas*, 4(2) Boletín Judicial 14
> (1982).

Por lo tanto, nuestro ordenamiento jurídico provee mecanismos

para disuadir la conducta temeraria. Uno de estos es la Regla 44.1(d)

de Procedimiento Civil, *supra*, que permite la imposición de honorarios

de abogado a la parte que haya procedido con temeridad o frivolidad

en el proceso. Dicha determinación descansa en la sana discreción del

tribunal sentenciador. R, Hernández Colón, *op. cit.*, esc. 4, pág. 436.

Tan amplia es la discreción del tribunal sentenciador que este "puede

tomar en consideración la conducta observada por las partes antes de

presentarse la acción judicial y antes de ser emplazada la parte

demandada". *Íd.*, pág. 437.

Existirá temeridad cuando: 1) en la contestación a la demanda

se niegue responsabilidad, pero ésta se acepte posteriormente; 2) la

parte demandada se defienda injustificadamente de la acción; 3) se

crea que la cantidad reclamada es exagerada y esa sea la única razón

para oponerse a los reclamos del demandante, en lugar de admitir

responsabilidad y limitar la controversia a la fijación de la cantidad

reclamada; 4) el demandado se arriesgue a litigar un caso del que surja

a todas luces su responsabilidad; o, 5) cuando se niegue un hecho

cuya certeza le consta a quien hace la alegación. *O.E.G. v. Román*, 159

DPR 401 (2003); *Dominguez v. GA Life*, 157 DPR 690 (2002). Cuando

un tribunal de instancia estime que exista temeridad, este viene

obligado a imponer honorarios. Los foros apelativos, en consecuencia,

**solo deben intervenir con la imposición de honorarios cuando**

**medie un claro abuso de esa discreción**. *Meléndez Vega v. El Vocero,* 189 DPR 123, 211 (2013).

Con relación al caso de autos, estamos de acuerdo con el TPI en que el proceder de PDCM fue temerario. En primer lugar, PDCM tenía una obligación incontrovertida de reparar aquellos daños causados al inmueble, en específico las filtraciones. Cuando el Sr. Herrera percibió que había una filtración proveniente del techo de su negocio localizado en Plaza del Carmen Mall, le informó a PDCM. No obstante, PDCM hizo caso omiso y permitió que la filtración subsistiera, lo que le ocasionó daños al Sr. Herrera. En múltiples ocasiones, el Sr. Herrera se comunicó con PDCM para exigir el reparo de la filtración, y cada vez, PDCM lo ignoró e incumplió con su deber. No tenemos duda de que, si PDCM hubiese cumplido con su obligación desde un principio, no se tuviese que haber recurrido a los tribunales. Dicho de otra manera, la culpa de este pleito recae completamente en la conducta de PDCM antes de que el mismo fue instado. Por lo tanto, al haber actuado temerariamente, procede la imposición de honorarios. No se cometió el error.

## IV.

Por los fundamentos discutidos, confirmamos la *Sentencia.*

Lo acordó el Tribunal y lo certifica la Secretaria.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones