Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
**PANEL ESPECIAL**

| JUAN J. GONZÁLEZ Y OTROS<br><br>Apeladas<br><br>v.<br><br>LUIS GERMAN CACHO CORDERO Y OTROS<br><br>Apelantes<br><br>. | KLAN202500294 | *Apelación* procedente del Tribunal de Primera Instancia, Sala Superior de San Juan<br><br>Caso Núm.: SJ2023CV05269<br><br>Sobre: DAÑOS, INTERDICTO POSESORIO; CUMPLIMIENTO ESPECÍFICO DE CONTRATO; SENTENCIA DECLARATORIA |
|---|---|---|

Panel integrado por su presidenta, la Jueza Grana Martínez, el Juez Candelaria Rosa y la Jueza Díaz Rivera

Grana Martínez, Jueza Ponente

**SENTENCIA**

En San Juan, Puerto Rico, a 13 de junio de 2025.

Los apelantes, Luis German Cacho Cordero, Norma Machado Ortiz y su sociedad legal de gananciales solicitan que revoquemos la Sentencia en la que el Tribunal de Primera Instancia declaro ha lugar sumariamente la demanda en su contra.

Por su parte, los apelados, Juan J. González y Natalia Rodríguez presentaron su oposición al recurso. Perfeccionada la apelación ante nuestra consideración resolvemos.

**I**

Los hechos procesales pertinentes para atender este recurso son los siguientes.

La controversia entre las partes tiene su génesis en el arrendamiento de una propiedad inmueble ubicada en el Viejo San Juan. Surge del expediente ante nuestra consideración que las partes otorgaron Contrato de Arrendamiento y Opción de

Número Identificador

SEN2025 _____

Compraventa.[1] Culminada la vigencia del contrato, surgió una controversia entre las partes relacionada a la interpretación de cierta clausula contractual sobre la reserva expresa o no, de vender la propiedad.

Por tal desavenencia los apelados presentaron una demanda Sobre Interdicto Posesorio, Cumplimiento Específico de Contrato, Daños y Sentencia Declaratoria contra los apelantes. Por su parte, los apelantes negaron las alegaciones de la demanda en las que se le imputó incumplimiento de contrato. En el proceso el TPI dictó una Sentencia Parcial de desistimiento sin perjuicio, respecto a la causa de acción de interdicto posesorio, posteriormente ordenó al Registrador de la Propiedad registrar Anotación Preventiva de Demanda sobre el inmueble en controversia.

Durante el transcurso del pleito, la parte apelante, presentó una Moción de Sentencia Sumaria en la que alegó que se reservó el derecho a no vender la propiedad según consignado en la cláusula 16.4 del Contrato de Promesa de Compraventa, y, por ende, a no otorgar la escritura de compraventa. Además, argumentó que el contrato de arrendamiento incluyó obligaciones y restricciones que son incompatibles con una compraventa cierta.[2] . Por su parte, la apelada también solicitó sentencia sumaría a su favor.[3] La apelada alegó que no existía controversia de que la apelante; (1) se obligó a vender la propiedad y a otorgar la escritura de compraventa y (2) actuó de mala fe e incurrió en dolo en las negociaciones y en el cumplimiento de sus obligaciones. Según la apelada, de las expresiones de la apelante en su deposición, puede concluirse que nunca tuvo intención de venderle la propiedad a pesar de que durante la negociación y la firma del acuerdo manifestó lo contrario.

---

[1] Véase Anejo, Sistema Unificado de Administración y Manejo de Casos (SUMAC) entrada número 52.
[2] Apéndice del recurso, página 220.
[3] Id, página 436.

La apelada reclamó el cumplimiento específico del Contrato de Promesa de Compraventa y el resarcimiento de daños por el incumplimiento de la obligación de vender la propiedad.

Por otro lado, la apelada se opuso a moción de sentencia sumaria de la apelante.[4] Argumentó que la interpretación de la apelante de la cláusula 16.4 no derrota el cumplimiento de las obligaciones que asumió mediante sus expresiones precontractuales, su conducta durante las negociaciones y en el propio contrato. Además, advirtió que la apelante también incumplió con la regla 36.3(d) de Procedimiento Civil, 32 LPRA Ap. V. En específico señalo que no incluyó una referencia a los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecieran los hechos propuestos.

Por su parte, la apelante también presentó oposición a moción de sentencia sumaria de la apelada. No obstante, indicó que no tenía que responder a los hechos propuestos en los que se le imputaba dolo y fraude, porque no eran parte de las alegaciones de la demanda y no podían traerse por primera por la vía sumaria. Por último, insistió en que, conforme a lo pactado en la cláusula 16.4 del Contrato de Promesa de Compraventa, no estaba obligado a vender la propiedad.

Así las cosas, el TPI celebró una vista argumentativa para discutir las mociones dispositivas de ambas partes.[5] Luego de examinarlas, junto a sus respectivas oposiciones, los documentos que forman parte del expediente judicial y los argumentos presentados en la Vista Argumentativa, dicto Sentencia[6] en la cual determinó los hechos siguientes.

> 1. Los Demandados son titulares a título ganancial del inmueble residencial ubicado en 65 Calle San Francisco, Viejo San Juan, inscrito al Asiento 14to en el Folio 141 del

---

[4] Id, página 520.
[5] Apéndice del recurso, página 600.
[6] SUMAC, entrada número 66.

Tomo 187, Finca Numero 102, Registro Inmobiliario de San Juan, Sección Primera.

2. EL 19 de junio de 2019, los Demandados contrataron los servicios de la corredora de bienes raíces, Priscilla Ferrer (en adelante, la "Corredora"), para mercadear la Propiedad para la venta. El contrato con la Corredora era para vender la Propiedad. La Sra. Ferrer ha sido la corredora asignada por *Luxury Collection Real Estate* para las gestiones relacionadas a la Propiedad.

3. Los Demandados únicamente tenían interés para vender la Propiedad, no arrendarla. Por tanto, el contrato con la Corredora no incluía el mercadeo de la Propiedad para su arrendamiento.

4. En el año 2020, la Propiedad estaba mercadeada para la venta en la plataforma de Clasificados Online.

5. Durante ese tiempo, la codemandante Natalia Rodríguez, le hace un acercamiento a la Corredora para ver si a los Demandados le interesaba arrendar la Propiedad. La Corredora se lo informó a la Parte Demandada, quien le expresó que lo consideraría.

6. Los Demandados evaluaron la alternativa de arrendar el inmueble y afirmaron que sí les interesaría arrendar la Propiedad.

7. Por tanto, las Partes suscribieron un primer contrato de arrendamiento sobre la Propiedad el 30 de marzo de 2020, con vigencia de 1 de junio de 2020 al 31 de mayo de 2021, y el inmueble se dejó de mercadear para venta ("Primer Contrato de Arrendamiento").

8. El Primer Contrato de Arrendamiento se suscribió entre las Partes por un término de un (1) año.

9. Al concluir el Primer Contrato de Arrendamiento, en ese momento, la Parte Demandante no tenía la capacidad económica para comprar la Propiedad.

10. Cercano a vencer el arrendamiento, la Parte Demandante contactó a la Corredora y le expresaron que estaban interesados en alquilar el inmueble con opción a compra, si a los dueños le interesaba.

11. La Corredora le informó a la Parte Demandada el interés de la Parte Demandante.

12. Posteriormente, el 11 de mayo de 2021, las Partes otorgaron un *Contrato de Arrendamiento y Contrato de Promesa de Compraventa, sobre la Propiedad,* cuyo término de vigencia sería de dos (2) años, hasta el 31 de mayo de 2023, de acuerdo con las disposiciones de la Sección 1.

13. A tenor con la Sección 16.1 del Contrato de Promesa de Compraventa, las Partes se obligaron recíprocamente a llevar a cabo la compraventa de la Propiedad. Citamos:

16. PROMESA DE COMPRAVENTA

16.1 La Parte Arrendadora y la Parte Arrendataria por la presente expresa y recíprocamente SE OBLIGAN a llevar a cabo la Compraventa de la Propiedad en o antes de la culminación del día treinta (30) contado a partir de la culminación del segundo año de arrendamiento, equivalente dicho término al periodo comprendido entre el comienzo del día natural correspondiente al 1 de junio de 2023 hasta la culminación del día natural del 30 de junio de 2023. Para mayor claridad, las Partes expresamente afirman que, durante la vigencia del arrendamiento, es decir durante el periodo comprendido entre el 1 de junio de 2021 y el 31 de mayo de 2023, la Parte Arrendataria no podrá exigir a la Parte Arrendadora que le venda la Propiedad y la Parte Arrendadora no podrá exigir a la Parte Arrendataria que se la compre. Durante dicho periodo la Parte Arrendadora tampoco podrá vender, mercadear u ofrecer la Propiedad a persona o entidad alguna.

14. Para determinar el precio de la compraventa de la Propiedad, la Parte Demandada tomó en consideración la cantidad recibida de los cánones mensuales del primer arrendamiento de la Parte Demandante y, además, de la renta que iba a recibir la Parte Demandante durante los dos años de arrendamiento bajo el Contrato de Promesa de Compraventa.

15. En vista a lo anterior, las Partes acordaron que el precio de la compraventa de la Propiedad sería por una cantidad total de un millón setecientos mil dólares con cero centavos ($1,700,000.00).

16. La Parte Demandante remitió puntualmente a los Demandados todos los pagos dentro del término contractual sobre el canon mensual de arrendamiento por la cantidad de siete mil dólares con cero centavos ($7,000.00) y la Parte Demandada aceptó todos los pagos antes mencionados.

17. Antes de firmar el Contrato de Promesa de Compraventa, las Partes intercambiaron borradores del contrato. El 27 de abril de 2021, la Parte Demandante le envió a la Corredora las revisiones realizadas por la representación legal de la Parte Demandante al contrato propuesto por la Parte Demandada.18 Dichas revisiones fueron rechazadas por la Parte Demandada.19 Además, ante ciertas preocupaciones manifestadas por la Parte Demandante, las Partes celebraron una reunión para aclarar ciertas dudas relacionadas al Contrato de Promesa de Compraventa y el Adelanto del precio de Compraventa.

18. Las partes se reunieron entre el 5 y 11 de mayo de 2021 para discutir el contrato propuesto y, el 11 de mayo de 2021, las Partes firmaron el *Contrato de Arrendamiento y el Contrato de Promesa de Compraventa*.

19. Entre los asuntos discutidos en la reunión previo a la firma del acuerdo, se discutió la Sección 16.3, mediante la cual se acordó que la Parte Demandante le entregaría a la Parte Demandada la cantidad de cincuenta mil dólares con cero centavos ($50,000.00) como adelanto del precio de compraventa ("Adelanto").

20. La Parte Demandada no depositó el Adelanto en una cuenta plica o "escrow", a pesar de esto no ser la práctica de la Corredora.

21. Sin embargo, ante las preocupaciones de la Parte Demandante sobre el depósito del Adelanto en una cuenta personal en vez de en una cuenta plica, la Parte Demandada le aseguró a la Parte Demandante, frente a la Corredora y previo a la firma del Contrato de Promesa de Compraventa, que dicho pago era el adelanto del precio de la compraventa de la Propiedad.

22. En virtud de la reunión celebrada y ante las expresiones de la Parte Demandada relacionadas a que su interés e intención era vender en todo momento la Propiedad, la Parte Demandante procedió a firmar el Contrato de Promesa de Compraventa.

23. Inclusive, ante las preocupaciones de la Parte Demandante sobre la seguridad de que se iba a realizar la compraventa dentro del término pactado en el *Contrato de Promesa de Compraventa*, los Demandados le aseguraron que no tenían que preocuparse, que "el resultado iba a ser el mismo, que, en efecto, se estaba haciendo una compraventa".

24. A su vez, la codemandada, Machado-Ortiz, admitió que firmó el Contrato de Promesa de Compraventa con la Parte Demandante sabiendo que la Parte Demandante tenía interés de comprar la Propiedad.

25. En vista a lo anterior, y ante las manifestaciones de la Parte Demandada, la Parte Demandante confió en la voluntad y el compromiso que expresó reiteradamente la Parte Demandada sobre la seguridad de que se iba a llevar a cabo la compraventa de la Propiedad. No obstante, luego de más de dos años de haber negociado y suscrito el *Contrato de Promesa de Compraventa*, la Parte Demandada admitió en su deposición del 13 de diciembre de 2023, que nunca tuvo intención de vender la Propiedad.

26. Inclusive, la codemandante Machado-Ortiz admitió que "de ninguna manera yo me quiero ver obligada a vender la propiedad".

27. La Parte Demandada "nunca" había tenido "un interés de vender esta casa genuinamente".

28. Las expresiones de la codemandada Machado-Ortiz, son contrarias a las expresiones de la Parte Demandada durante las negociaciones del Contrato de Promesa de Compraventa.

29. La Sección 16.4 del Contrato de Promesa de Compraventa dispone que la Parte Demandante le podrá exigir a la Parte Demandada, y viceversa, a comparecer al otorgamiento de la correspondiente escritura de compraventa, únicamente durante el periodo comprendido entre el 1 de junio de 2023 hasta el 30 de junio de 2023.

30. El 1 de mayo de 2023, la Corredora, por orden de la Parte Demandada, le envió un correo electrónico a la Parte Demandante mediante el cual notificó a la Parte Demandante (a) que habían decidido no vender la Propiedad, (b) que se procedería a devolver la cantidad de $50,000.00, (c) el término del alquiler finalizaría al 31 de mayo de 2023 y, (d) que pasarían a ocupar la Propiedad a partir del 1 de junio de 2023. Dicho correo electrónico también fue contrario a las expresiones de la Parte Demandada sobre su obligación, voluntad y compromiso de llevar a cabo la compraventa de la Propiedad.

31. Consecuentemente, el 15 de mayo de 2023, la Parte Demandante le cursó una Notificación de Incumplimiento a la Parte Demandada, mediante la cual se le notificó que su decisión de no proceder con la compraventa de la Propiedad podría constituir un incumplimiento con el Contrato de Promesa de Compraventa, toda vez que su decisión va en contra del contrato preliminar pactado en el referido contrato.

32. A su vez, mediante la Notificación de Incumplimiento la Parte Demandante le expresó a la Parte Demandada que su decisión de no proceder con la compraventa de la Propiedad fue comunicada fuera del término pactado para exigir el otorgamiento de la compraventa, el cual comienza el 1 de junio de 2023 y culmina el 30 de junio de 2023.

33. Sin embargo, el 24 de mayo de 2023, la Parte Demandada, por conducto de su representación legal, le envió a la Parte Demandante un correo electrónico mediante el cual negaron su obligación de otorgar la escritura de compraventa. En particular, la Parte Demandada le notificó a la Parte Demandada, por conducto de las respectivas representaciones legales, que (a) en o antes del 31 de mayo de 2023 devolverían la cantidad de $50,000.00, (b) que el 31 de mayo de 2023, 7:00 p.m., estos o su representante autorizado se personarían a la propiedad para recibir las llaves y llevar a cabo la inspección

34. El 31 de mayo de 2023, la Parte Demandada devolvió íntegramente la cantidad de $50,000.00, mediante cheque de gerente de Oriental Bank, cheque número 222735847, el cual fue recibido por conducto de su representación legal.

35. El codemandante, Juan J. González, depositó el cheque de gerente número 222735847 en su cuenta de banco con el único fin de poder emitir un nuevo cheque de gerente a favor del Secretario del Tribunal de Primera Instancia de San Juan por la cantidad del Adelanto.

36. El Adelanto se encuentra consignado en la Unidad de Cuentas mediante cheque a favor del Secretario del Tribunal de Primera Instancia de San Juan desde el 11 de agosto de 2023.

37. El 19 de junio de 2023, la Parte Demandante le exigió a la Parte Demandada a comparecer al otorgamiento de la escritura de compraventa sobre la Propiedad, de acuerdo con la obligación recíproca que surge del *Contrato de Promesa de Compraventa.*

38. El 1 de agosto de 2023, la Parte Demandante entregó las llaves y posesión de la Propiedad.

El foro primario concluyó que el Contrato de Promesa de Compraventa cumplió con todas las formalidades de un contrato preliminar. Según el TPI el contrato también cumplió todas las formalidades de un contrato futuro de compraventa, incluyendo la, (1) descripción de la propiedad, (2) la voluntad y obligación expresa y recíproca de las partes para **realizar** la compraventa culminado el arrendamiento, (3) el precio de la compraventa, (4) el pago de adelanto de precio de compraventa, (5) el término para comparecer al otorgamiento de la escritura de compraventa correspondiente, (6) la comisión de la corredora, (7) los gastos del notario público y de cierre de la compraventa (8) el contenido mobiliario incluido en la compraventa, y (9) otros asuntos pertinentes a la compraventa como los títulos y gravámenes y la advertencia federal sobre plomo. El TPI razono que solo faltaba que las partes comparecieran a otorgar la escritura de compraventa. Enfatizó que la apelante le garantizó reiteradamente a la apelada, durante el proceso de negociaciones que la compraventa sería el resultado del Contrato de Arrendamiento y Promesa de Compraventa. Según el foro primario la apelada firmó el Contrato de Promesa de Compraventa porque confió en la voluntad y compromiso expresamente manifestado por la apelante. No obstante, el tribunal hizo constar que la apelante admitió, durante el descubrimiento de prueba que, nunca tuvo el interés genuino de vender la propiedad. El TPI concluyó que la

apelante firmó el Contrato de promesa de Compraventa a sabiendas de que la apelada quería comprar la propiedad. Según el foro recurrido la apelante admitió durante el descubrimiento de prueba que cometió dolo en las negociaciones precontractuales y que no obro de buena fe, por lo que resolvió que la apelada tenía derecho al cumplimiento específico y no meramente a daños, porque la promesa de compraventa era una obligación recíproca.

El foro primario rechazó los cuestionamientos a las determinaciones de hechos basadas en el testimonio de la corredora de bienes raíces porque no fue parte del contrato. Según el TPI; (1) ambas partes admitieron que la corredora suscribió un contrato con la apelante para la venta de la propiedad, (2) a través de los hechos propuestos por ambas partes surge el rol de la corredora en la compraventa y como estuvo envuelta desde un principio en el proceso de arrendamiento y venta de la propiedad. Por tales razones el foro concluyó que era evidente que la corredora tenía conocimiento personal de las declaraciones de las partes sobre la propiedad y el negocio de arrendamiento y venta. El foro apelado advirtió que su conclusión estaba basada en los propios hechos propuestos por ambas partes en sus respectivas mociones de sentencia sumaria.

Finalmente, el TPI dispuso del pleito declarando no ha lugar la Moción de Sentencia Sumaria de la apelante y ha lugar Moción de Sentencia Sumaria de la apelada y consecuentemente la demanda. Como resultado determinó que:

1. Las partes estaban obligadas mediante el Contrato de Promesa de Compraventa a comparecer al otorgamiento de la escritura de compraventa.

2. La apelante actuó de mala fe al suscribir el Contrato de Promesa de Compraventa a sabiendas que su intención nunca fue vender la Propiedad.

3. La apelante incumplió con sus obligaciones contractuales.

4. Ordenar el estricto cumplimiento de las partes con el Contrato de Promesa de Compraventa y el otorgamiento de la escritura de compraventa conforme los términos acordados en el contrato.

Inconforme, la apelante presentó este recurso en el que alega que:

1) Erró el Tribunal de Primera Instancia al concluir que la Parte Apelante-Demandada actuó de mala fe al suscribir Contrato de Promesa de Compraventa a sabiendas que su intención nunca fue vender la Propiedad, a pesar de que en la demanda no se alegó ni reclamó dolo o mala fe en la contratación ni en momento alguno se enmendó la misma para imputar conducta dolosa o mala fe durante dicha etapa, en contravención, a la normativa dispuesta por el Tribunal Supremo en Mayagüez Hilton v. Betancourt, 156 DPR 234 (2002).

2) Erró el Tribunal de Primera Instancia al prescindir, descartar y o tener  por no puesta la sección 16.4 del Contrato suscrito por las Partes:

    a.    A pesar de que la sentencia apelada se dictó sumariamente y la demanda no adiciona materias sobre ineficiencia, ilegibilidad, inoponibilidad, o invalidez de dicha cláusula.

    b.    A pesar de que no obra determinación judicial entendiendo de la ineficacia, inexigibilidad, inoponibilidad o invalidez de dicha cláusula.

3) Erró el Tribunal de Primera Instancia al concluir que las Partes estaban obligadas mediante el Contrato de Promesa de Compraventa a comparecer al otorgamiento de la escritura de compraventa al culminarse el arrendamiento, a pesar de que (a) el arrendamiento contenía una cláusula que imponía la obligación de entregar el inmueble en caso de no tener lugar la compraventa, (b) el contrato entre las Partes contenía una cláusula que sujetaba la compraventa a un consentimiento posterior, y (c) contra dichas cláusulas no obra determinación judicial resolviendo que las mismas sean ineficaces.

4) Erró el Tribunal de Primera Instancia al concluir que la Parte Apelante Demandada incumplió con sus obligaciones contractuales y disponer que procede el cumplimiento estricto de otorgar una escritura de compraventa.

5) El Tribunal de Primera Instancia erró e incurrió en abuso de discreción al concluir que la Parte Apelante Demandada se defendió injustificadamente de la demanda e imponer temeridad imponiéndole el pago de $25,00.00 de honorarios de abogado.

## II

### Sentencia Sumaria

### Moción de Sentencia Sumaria

Nuestro ordenamiento procesal civil reconoce el uso y valor que tiene la sentencia sumaria para asegurar una solución justa, rápida y económica de los casos. La herramienta procesal de la sentencia sumaria posibilita la pronta resolución de una controversia, cuando no es necesario celebrar un juicio en su fondo. No obstante, para que proceda es necesario que, de los documentos no controvertidos, surja que no hay controversia real y sustancial sobre los hechos materiales del caso. Un hecho material es aquel que puede afectar el resultado de la reclamación, de acuerdo con el derecho sustantivo aplicable. La controversia sobre los hechos materiales tiene que ser real. Cualquier duda es insuficiente para derrotar una moción de sentencia sumaria. La sentencia sumaria procede cuando no existe controversia de hechos materiales y únicamente resta aplicar el derecho. *Cruz, López v. Casa Bella y otros,* 213 DPR 980, 993 (2024); *Universal Ins. y otro v. ELA y otros,* 211 DPR 455, 471-472 (2023).

La Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, exige el cumplimiento de ciertos requisitos. La parte contra quien se haya formulado una reclamación podrá presentar una moción de sentencia sumaria, no más tarde de los treinta (30) días siguientes a la fecha límite establecida por el tribunal para concluir el descubrimiento de prueba. La antedicha regla contiene los requisitos de forma para instar una moción de sentencia sumaria y su respectiva oposición. La parte que sostenga la inexistencia de una controversia sustancial de hechos esenciales y pertinentes debe presentar una moción que se funde en declaraciones juradas u otra evidencia admisible. Además, tanto la moción como la oposición deberán cumplir con lo establecido en la Regla 36.3, *supra.* Por otra

parte, la sentencia sumaria no puede dictarse cuando, (1) existen hechos esenciales controvertidos, (2) la demanda tiene alegaciones afirmativas que no han sido refutadas, (3) existe una controversia real sobre algún hecho esencial o material que surge de los propios documentos que acompañan la moción o (4) no procede como cuestión de derecho. *Universal Ins. y otro v. ELA y otros,* supra, pág. 472.

Sin embargo, el Tribunal Supremo de Puerto Rico ha señalado que el uso de la sentencia sumaria no es aconsejable en casos complejos en los que no existe controversia sobre elementos subjetivos, de intención, propósitos mentales, negligencia o credibilidad. No obstante, aunque no es aconsejable, eso no impide utilizar el mecanismo de sentencia sumaria en reclamaciones que requieren elementos subjetivos o de intención, como en los casos de discrimen, cuando de los documentos a ser considerados surge que no existe controversia de hechos materiales. *Soto y otros v. Sky Caterers,* 2025 TSPR 3, 215 DPR ___ (2025). De igual manera, el Tribunal Supremo de Puerto Rico ha rechazado la posibilidad de una enmienda a las alegaciones mediante una moción de sentencia sumaria. *Mayagüez Hilton Corp. v. Betancourt,* 156 DPR 234, 256 (2002). La decisión *en León Torres v. Rivera Lebrón,* 2004 DPR 20, 45-49 (2020) ratificó que la moción en oposición a la sentencia sumaria no es el vehículo apropiado para presentar reclamaciones nuevas nunca antes aducidas en las alegaciones que constan en el tribunal.

Por otro lado, el Tribunal de Apelaciones se encuentra en la misma posición que el Tribunal de Primera Instancia, al momento de revisar las solicitudes de sentencia sumaria. Al igual que el TPI tiene que regirse por la Regla 36, *supra,* y aplicar los criterios que esa regla y su jurisprudencia interpretativa exigen. Ambos foros tienen que revisar que la moción de sentencia sumaria y su

oposición cumplan los requisitos de forma codificados en la Regla 36, *supra*. El Tribunal de Apelaciones no podrá considerar evidencia que las partes no presentaron en el Tribunal de Primera Instancia. Este foro tampoco podrá adjudicar los hechos materiales en controversia, porque esa es una tarea del Tribunal de Primera Instancia. La revisión que hace el Tribunal de Apelaciones es la de un juicio de novo. El foro apelativo debe examinar el expediente de la manera más favorable para la parte opositora a la moción de sentencia sumaria y hacer todas las inferencias permisibles a su favor. *Cruz, López v. Casa Bella y otros,* supra; pág. 924, *Meléndez González et al. v. M. Cuebas,* 193 DPR 100, 118 (2015).

Al revisar una sentencia sumaria, el Tribunal de Apelaciones tiene que evaluar si realmente existen hechos materiales en controversia. Cuando determina que existen hechos materiales en controversia debe exponer cuáles son. Además, tiene que determinar cuáles están incontrovertidos. Si encuentra que todos los hechos materiales están realmente incontrovertidos, procede que revise de novo, si el TPI aplicó correctamente el derecho. *Meléndez González et al. v. M. Cuebas,* supra, pág. 119.

### Interpretación de los Contratos

El artículo 354 del actual Código Civil, 31 LPRA sección 6342, nos da las reglas para interpretar los negocios jurídicos. La buena fe en la otorgación de los negocios jurídicos se presume. El sentido literal de las palabras prevalece cuando los términos de un negocio bilateral son claros y no dejan duda sobre la intención de las partes. No obstante, la intención prevalece sobre lo expresado cuando las palabras parecen contrarias a la intención evidente de las partes. La intención se determina, atendiendo principalmente la conducta coetánea, posterior o anterior al otorgamiento. El artículo 356, 31 LPRA sección 6344, establece que las cláusulas contractuales deben interpretarse las unas por medio de las otras y, mediante la

atribución del sentido apropiado al conjunto. Las cláusulas especiales prevalecen sobre las generales. Las incorporadas por el otorgante prevalecen sobre las predispuestas. Según lo dispuesto en el artículo 357, 31 LPRA sección 6345 la denominación del negocio jurídico no determina de por sí sola su naturaleza. Por último, el artículo 358, 31 LPRA sección 6346, establece la forma en que se interpretaran las disposiciones ambiguas. Cuando el negocio es oneroso, la interpretación será a favor de la mayor proporcionalidad de intereses. Las cláusulas de un negocio bilateral serán interpretadas de forma desfavorable a quien la redactó y a favor de quien tuvo menor poder de negociación.

### Dolo en la contratación

El dolo es uno de los vicios del consentimiento. Artículo 285, 31 LPRA sección 6191. Los vicios de la voluntad pueden convertir el negocio jurídico en anulable, si han sido determinantes para el otorgamiento. El causante del dolo queda sujeto a la indemnización de los daños y perjuicios resultantes. La prueba de la existencia del dolo y de su carácter incumbe a quien lo alega. Artículo 286, 31 LPRA sección 6192. El dolo es el incumplimiento deliberado y de mala fe de la obligación. Artículo 1164, 31 LPRA sección 9316. Por su parte, el dolo grave es la acción u omisión intencional mediante la que una parte o un tercero inducen a otra parte a otorgar un negocio jurídico que de otra parte no se hubiese realizado. Artículo 292, 31 LPRA sección 6211. El dolo incidental no invalida el negocio jurídico. Su autor debe indemnizar el daño causado. Por su parte el dolo reciproco no invalida el negocio ni obliga a resarcir. Artículo 294, 31 LPRA sección 6213.

Ahora bien, el dolo en el incumplimiento contractual es la negativa consciente y voluntaria del deudor a cumplir con su obligación, a sabiendas de que realizara un acto injusto. No obstante, no implica necesariamente un designo malévolo del

deudor, solo el conocimiento de su incumplimiento y la consciencia de que ha de afectar la expectativa del acreedor. La determinación de dolo requiere una acción afirmativa del que reclama dolo. Sin embargo, no es necesario utilizar el vocablo dolo en la alegación, porque bastara ver la naturaleza de la reclamación para determinar si se imputa una conducta dolosa. Los tribunales deben determinar si de la naturaleza de las alegaciones son suficientes para establecer claramente los elementos constitutivos del dolo en el cumplimiento de la obligación. *Mayagüez Hilton Corp. v. Betancourt*, supra págs.252-253.

**Contrato Preliminar**

El Artículo 1235 del Código Civil, 31 LPRA 9756, define el contrato preliminar como aquel mediante el que las partes se obligan a celebrar un contrato futuro. Al contrato preliminar se le denominara Opción, cuando una sola de las partes tiene la facultad de decidir la celebración el contrato futuro. El contrato preliminar no está sujeto a cumplir las formalidades que debe satisfacer el contrato futuro. El tribunal puede exigir su estricto cumplimiento, cuando la parte requerida se niega al otorgamiento del nuevo contrato. A su vez, el Artículo 1235, *supra,* incorpora elementos del Artículo 1340 del Código Civil de 1930, 31 LPRA sección 3747 sobre la promesa de vender. Según el Artículo 1340 la promesa de vender le da derecho a los contratantes a reclamarse recíprocamente el cumplimiento del contrato, si existe conformidad de la cosa y en el precio. Las partes se regirán por lo dispuesto sobre las obligaciones y los contratos en caso de que la promesa de compra y venta no pueda cumplirse.

El Tribunal Supremo de Puerto Rico confirió a la promesa bilateral de compraventa, el carácter de contrato preparatorio, y le atribuyó la obligación de hacer, pero no de dar ya que el objeto de realizar en el futuro es un contrato de compraventa. Este tipo de

contrato crea una obligación personal que no crea un derecho real, ni confiere título ni dominio sobre la propiedad en cuestión. *Soto v. Rivera,* 144 DPR 500, 509-510 (1997); *Jordán-Rojas v. Padró González,* 103 DPR 813, 817(1975). El contrato de promesa bilateral de venta sirve para vincular inmediatamente a las partes, cuando por alguna razón no puede otorgarse una compraventa completa. A través de la vinculación inmediata, las partes logran la garantía o seguridad de que el contrato definitivo o completo se celebrará o concluirá más tarde. La negativa de una de las partes a cumplir el precontrato confiera a la otra parte una causa de acción para exigir su cumplimiento específico y no meramente una acción por daños. No obstante, eso depende de que la prestación básica no se refiera a hechos personalísimos o que las líneas básicas en el precontrato no sean insuficientes. El acreedor en un contrato de promesa bilateral de venta de un inmueble podrá exigir su cumplimiento, la celebración de una venta previamente convenida y el otorgamiento de la correspondiente escritura pública. *Rossy v. Tribunal Superior,* 80 DPR 729,742-743 (1958).

### Enmiendas a la Demanda

El procedimiento para enmendar las alegaciones está regulado en la Regla 13 de Procedimiento Civil, 32 LPRA Ap. V. Cualquier parte podrá enmendar sus alegaciones sin autorización del tribunal, antes de que se le notifique una alegación responsiva. El término para hacer enmiendas sin autorización del tribunal es veinte días, en el caso de las alegaciones que no admitan alegación responsiva y no se ha señalado el juicio. Cualquier otro escenario, requiere la autorización del tribunal o el consentimiento de la otra parte para enmendar las alegaciones. Las partes podrán enmendar las alegaciones, cuando por alguna razón válida en derecho han cometido una omisión. Las enmiendas sirven para abundar en las alegaciones presentadas originalmente, ampliar las causas de

acción expuestas en una demanda o añadir una o más causas de acción. Además, sirven para clarificar o ampliar una defensa previamente impuesta. No obstante, para que las enmiendas se retrotraigan a la demanda deben de surgir de las misma conducta, acto, omisión o evento expuesto en la alegación original. *Dist. Unidos Gas v. Sucn. Declet Jiménez,* 196 DPR 96, 117-118 (2016).

### Honorarios por temeridad

Los tribunales tienen el deber de imponer el pago de honorarios al abogado a cualquier parte o abogado que haya actuado de forma temeraria o frívola. El tribunal adjudicará en la sentencia la suma que entienda correspondiente a esa conducta. Regla 44.1(d) de las de Procedimiento Civil, 32 LPRA Ap. V. La temeridad es un concepto amplio. Un litigante es temerario cuando sus actuaciones ocasionan un pleito que pudo evitarse, provoca la prolongación indebida del trámite judicial u obliga a la otra parte a incurrir en gastos innecesarios para hacer valer sus derechos. La temeridad también es la conducta asumida por un litigante perdidoso que por su terquedad, testarudez, obstinación, contumacia, empecinamiento e insistencia en una actitud desprovista de fundamentos obliga a otra parte a asumir innecesariamente las molestias gastos e inconvenientes de un pleito. *SLG González – Figueroa v. SLG at al,* 2009 DPR 138, 148-149 (2022); *Fernández v. San Juan Cement Co, Inc.,* 118 DPR 713, 717-719(1987). La imposición de honorarios de abogados a la parte temeraria descansa en la sana discreción del foro primario. Por esa razón, solo puede variarse en apelación si se demuestra que abusó de su discreción. *SLG González – Figueroa v. SLG at al,* supra, pág. 150.

### III

Los errores señalados se reducen a determinar si no existe controversia de que la apelante incumplió con sus obligaciones

contractuales y que su conducta fue dolosa y temeraria. La contestación a esas interrogantes requiere que determinemos, si se perfeccionó un contrato preliminar o promesa de vender, mediante el que la apelante se obligó a vender el inmueble a la apelada.

Un juicio de novo de la totalidad de la prueba, nos convence de que el contrato suscrito por las partes cumple todos requisitos de un contrato preliminar o promesa de venta. Los otorgantes acordaron expresamente las cláusulas siguientes:

**16.1** La Parte Arrendadora y la Parte Arrendataria por la presente expresa y recíprocamente SE OBLIGAN a llevar a cabo la Compraventa de la Propiedad en o antes de la culminación del día treinta (30) contado a partir de la culminación del segundo año de arrendamiento, equivalente dicho término al período comprendido entre el comienzo del día natural correspondiente al 1 de junio de 2023 hasta la culminación del día natural del 30 de junio de 2023. Para mayor claridad, las Partes expresamente afirman que, durante la vigencia del arrendamiento, es decir durante el periodo comprendido entre el 1 de junio de 2021 y el 31 de mayo de 2023, la Parte Arrendataria no podrá exigir a la Parte Arrendadora que le venda la Propiedad y la Parte Arrendadora no podrá exigir a la Parte Arrendataria que se la compre. Durante dicho período la Parte Arrendadora tampoco podrá vender, mercadear u ofrecer la Propiedad a persona o entidad alguna.[7]

16.2 Precio de Compraventa Las partes acuerdan el Precio de Compraventa de la Propiedad en la cantidad de UN MILLON SETECIENTOS MIL DOLARES CON CERO CENTAVOS ($ 1,700,000) pagadero en moneda legal y corriente en nuestra jurisdicción.

16.3 Adelanto del Precio de Compraventa A la firma de este Contrato la Parte Arrendataria entrega a la parte arrendadora la cantidad de CINCUENTA MIL DOLARES CON CERO CENTAVOS. ($50.000.00) en concepto de Adelanto del Precio de Compraventa. Las Partes reconocen y afirman que se trata de un adelanto de un precio de compraventa por concepto de una obligación reciproca de venderse y comprarse, por lo cual dicho monto no queda sujeto a segregación de fondos por la Parte Arrendadora ni sujeto a entrega, depósito o retención alguna para fines de segregación de fondos por parte de tercero alguno.

16. 4 Obligatoriedad de la Compraventa. Durante el período comprendido entre el comienzo del día natural correspondiente al 1 de junio de 2023 y la culminación del día natural del 30 de junio de 2023, la Parte Arrendadora

---

[7] Apéndice del recurso, página número 74.

podrá exigir a la Parte Arrendataria y la Parte Arrendadora que se comparezca al otorgamiento de la correspondiente escritura de compraventa. Si la Parte Arrendataria se negare a comprar, o no pudiera comprar, o no quisiera comprar, *sea o no tal condición o negatoria atribuible a los de la propia Parte Arrendataria,* la Parte Arrendadora entonces tendrá pleno y absoluto derecho a <u>retener</u> para sí el Adelanto del Precio de Compraventa. Si la Parte Arrendadora se negare a vender, o no pudiera vender, o no quisiera vender, *sea o no tal condición o negatoria atribuible a actos de la propia Parte Arrendadora,* la Parte Arrendataria entonces tendrá derecho pleno y absoluto derecho a la devolución íntegra del Adelanto del Precio de Compraventa. Para mayor claridad, las Partes expresamente afirman que el otorgamiento de la escritura de compraventa y el Precio de Compraventa en forma alguna quedan sujetos a que la Parte Arrendataria obtenga financiamiento ni sujeto a ajuste alguno por motivo de valor reflejado en tasación.

....

Acuerdo Total y No Renuncia Derechos. Este contrato constituye la totalidad del acuerdo entre las partes con respecto a la materia y objeto del mismo, y sustituye y deja sin efecto cualquiera otros acuerdos anteriores ya sean orales o por escrito. Las partes han participado activamente en la negociación de este Contrato y han tenido plena oportunidad conforme así estas lo han decidido y efectuando, para revisar su contenido, orientarse sobre el mismo y sugerir enmiendas previo a su firma, por lo cual este Contrato no será interpretado restrictivamente a favor ni en contra de ninguna de las Partes. En la eventualidad de que alguna de las partes incumpla con sus obligaciones según contenidas en este Contrato y la otra Parte no acciones o reclame sus derechos por tal o tales incumplimientos, tal inacción no se entenderá, en forma alguna, que tal Parte ha renunciado a reclamar retroactiva y o prospectivamente el cumplimiento específico de la obligación violentada, incluyendo cualquier penalidad procedente en ley o dispuesta en este contrato , así como a reclamar los daños y perjuicios que tal incumplimiento ocasione.

La apelante alega que se reservó el derecho a no vender la propiedad en la cláusula 16.4 y que conforme a lo pactado solo estaba obligada a devolver el adelanto del precio de venta. La cláusula 16.4 reconoce claramente el derecho de las partes a exigirse mutuamente el otorgamiento de la escritura de compraventa, dentro de los treinta días siguientes al vencimiento del arrendamiento. Únicamente contempla la devolución del adelanto del precio de venta en caso de incumplimiento. No obstante, no impide ni prohíbe exigir el cumplimiento específico de

la obligación y mucho menos limita el derecho de la arrendataria a solicitar el otorgamiento de la escritura de compraventa.

La apelante, obvia que el contrato incluyó una cláusula de No Renuncia de Derechos en la que las partes acordaron expresamente que no renunciaban a (1) el cumplimiento específico de la obligación violentada, (2) cualquier penalidad procedente en ley o dispuesta en el contrato, (3) los daños y perjuicios, aun en caso de no haber accionado o reclamado sus derechos, debido al incumplimiento de la otra parte. Por eso, resolvemos que la apelada tenía derecho a solicitar el cumplimiento específico de la obligación, aun en el supuesto de que no lo hubiese accionado o reclamado. No obstante, es un hecho que la apelada, sí solicitó el cumplimiento de la obligación dentro del plazo acordado en la sección 16.4.

Las admisiones e inconsistencias en los testimonios de los apelantes evidencian su incumplimiento. El señor Cacho negó que el negocio fuera una compraventa, porque el apelado no tenía el dinero para comprar.[8] No obstante, admitió que el contrato tenía el precio de venta de un millón setecientos mil dólares y que no aceptó que el adelanto se depositara en una cuenta *scrow*.[9] Por su parte, la apelante admitió que no quería vender la propiedad. Aunque dijo que la apelada no podía comprar, aceptó que establecieron el precio de venta, por si se daba la compraventa. La señora Machado Ortiz declaró que se negaron a firmar el contrato con el lenguaje de opción a compra, porque no querían vender la propiedad. La apelante, testificó que le dijo a su abogado que cambiara el nombre al contrato porque no quería verse obligada a vender. Fue enfática en que para ella era un requisito que no estuviera obligada a vender. Durante su deposición se le preguntó, ¿porque firmó el contrato de promesa de venta? Su contestación no nos satisface. La apelante contestó que

---

[8] Apéndice del recurso, página número 463.
[9] Id., páginas número 464 y 467 a 468.

firmó, porque eran muy buenas personas, llevaban un año en la propiedad y si no firmaban iban a tener que botarlos. Además, dio como excusa que en el futuro los apelados podían tener interés de comprar, contrario a lo que declaró que no quería vender.[10]

La señora Machado Ortiz admitió que recibió los $50,000.00. Aunque negó que fuera un adelanto del precio de compraventa, no pudo explicar para que era esa cantidad. Su testimonio es contradictorio con su versión de que nunca tuvo la intención de vender. La apelante dijo que para ellos era muy oneroso sacar la propiedad del mercado por dos años, sin poder venderla a otra persona. Según la apelante esa era la manera de recuperar las perdidas por no poder venderla a otra persona durante esos dos años.[11]

El testimonio de la corredora de bienes raíces, mediante la que las partes gestionaron la compraventa, confirma las admisiones de los apelantes. La señora Priscilla Ferrer Viscasillas declaró que los apelantes contrataron sus servicios para vender la propiedad y así consta en el contrato. La corredora testificó que los apelantes no contemplaron la renta, sin embargo, originalmente le alquilaron la propiedad a los apelados. La señora Ferrer declaró que cuando culminó el arrendamiento, los apelados le manifestaron su deseo de alquilar con opción a compra. Fue enfática en que los apelantes le dijeron que estaban de acuerdo porque su interés era vender la propiedad.[12]

La corredora de bienes raíces nos confirma los hechos a continuación. Los abogados de la apelante prepararon el contrato. El uso de la palabra promesa creo inseguridad a los apelados, porque les daba la impresión de que me puedo salir si quiero. Los abogados de la apelante dijeron que se podía parafrasear. Sin

---

[10] Apéndice del recurso, páginas número 471 a 479.
[11] Id, página número 480.
[12] Id, páginas número 262 a 266.

embargo, el señor Cacho dijo que el contrato tenía que firmarse como estaba, porque de lo contrario no realizaría el negocio. El apelante tampoco quiso que los cincuenta mil dólares de adelanto de precio de venta fueran a la cuenta *scrow*.[13] Los apelantes insistieron en que el documento se quedara como estaba.[14] Los apelados se tranquilizaron porque que el apelante manifestó que era un hombre de palabra. La corredora no pensó en ningún momento que el apelante no iba a cumplir.[15] Los apelados estaban preocupados por la forma en que estaba fraseado el contrato, pero como decía promesa de venta decidieron creerles a los apelantes y firmaron. [16] El abogado de la parte apelante ratificó que su cliente quería vender y que no iba a ocurrir ningún problema.[17] Por último, la corredora explicó que el precio de venta original era de un millón nueve algo. Sin embargo, se acordó el precio de un millón setecientos mil dólares, porque la cantidad restante estaba cubierta por la renta. Fue clara en que el acuerdo se hizo con el señor Cacho.[18]

El testimonio del apelado coincidió con el de la corredora de bienes raíces. Su testimonio fue el siguiente. La corredora de bienes raíces le hizo llegar el acuerdo que le envió la parte apelante. El hizo unas revisiones y las envió al apelante con la corredora. El apelado acordó con la corredora otorgar un contrato de **opción a compra**.[19] No obstante, el 4 de mayo, la apelante envió un correo electrónico en el que le dio hasta el 5 de mayo para contestar.[20] El apelado se comunicó inmediatamente con la corredora, porque entendía que tenían un acuerdo. La corredora se reunió con los apelantes. Luego

---

[13] Apéndice del recurso, páginas número 269 a 272, 274, 490 a 491.
[14] Id, página número 490.
[15] Id, página número 272.
[16] Id, página número 278.
[17] Id, página número 493.
[18] Id, página número 582.
[19] Apéndice del recurso, páginas número 325 a 326 y 328
[20] Id, página número 330.

se dio la reunión para aclarar el acuerdo.[21] La versión firmada no incluyó las observaciones de la apelada, pero sí las aclaraciones que hizo la apelante.[22] El acuerdo firmado es el que preparó el apelante y que la corredora envió a la apelada el 22 de abril.[23] Durante el contrainterrogatorio el apelado reafirmó que el negocio otorgado era una compraventa y que la apelante no quiso que el adelanto estuviera en una cuenta *scrow*[24]. El apelado declaró que el abogado de los apelantes le manifestó que sus clientes tenían la intención de vender y que no iba a ser ningún problema.[25] También manifestó que el apelante le dijo que no podía aceptar el dinero en ese momento.[26]

La apelante alega que el TPI erró al permitir que la apelada presentara las alegaciones de fraude por primera vez en su oposición a la moción de sentencia sumaria, sin enmendar la demanda. Su representación legal tiene razón. La decisión del TPI es contraria a lo resuelto por el Tribunal Supremo de Puerto Rico en *Mayagüez Hilton Corp. v. Betancourt, supra, y León Torres v. Rivera Lebrón,* supra. Las partes no pueden traer alegaciones nuevas en el pleito mediante una moción de sentencia sumaria o en su oposición. Las alegaciones de la demanda no imputan dolo a la apelante. La apelada descubrió el dolo durante el descubrimiento de prueba, cuando la apelante admitió que nunca tuvo la intención de venderle la propiedad. No obstante, para incluir las alegaciones de dolo tenía que solicitar autorización del tribunal para enmendar la demanda conforme es requerido en la Regla 13, supra.

Por último, la apelante cuestiona la determinación de temeridad en su contra y la imposición de honorarios de abogado.

---

[21] Id, página número 331.
[22] Id, páginas número 332 a333.
[23] Id, página número 327 y 336.
[24] Id, páginas número 333 a 334.
[25] Id, página número 283.
[26] Id, página número 286.

La parte apelante no tiene razón. La determinación del TPI es correcta. Los apelantes fueron temerarios porque insistieron en litigar el pleito a sabiendas de que incumplieron con sus obligaciones contractuales y de que no tenían ninguna defensa valida frente a los apelados. La propia apelante admitió durante el descubrimiento de prueba que nunca tuvo intención de vender la propiedad a los apelantes. Aun así, los apelantes continuaron un pleito en el que insistieron en negar su incumplimiento. Su obstinación y temeridad sometió a la apelada a un pleito que pudo evitarse y ocupó innecesariamente los recursos del tribunal. La apelante tampoco cuestionó efectivamente la razonabilidad de los honorarios impuestos.

## IV

Se revoca la determinación de dolo de la sentencia apelada, pero se confirma en todo lo demás.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones